UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSHUA FRIEBELY,

                                 Plaintiffs,

v.                                                              1:18-CV-1458
                                                                (GTS/CFH)
C.D. PERRY & SONS, INC.; FINGER LAKES
INDUSTRIAL CONTRACTING CORP.; and
ATLAS PAINTING & SHEETING CORP.,

                                 Defendants.
_____

APPEARANCES:                                         OF COUNSEL:

HOFMANN & SCHWEITZER                      PAUL T. HOFMANN, ESQ.
   Counsel for Plaintiff
212 West 35th St., 12th Floor
New York, NY 10001

MARSHALL DENNEHEY WARNER COLEMAN      DEAN G. ARONIN, ESQ.
& GOGGIN, P.C.                                       JAMELE A. HAMAD, ESQ.
   Counsel for Defendant C.D. Perry & Sons, Inc.
88 Pine St., 21st Floor
New York, NY 10005

LAW OFFICES OF SIMON HARTER, ESQ.        SIMON HARTER, ESQ.
   Counsel for Defendant Finger Lakes Industrial
   Contracting Corp.
30 Nassau St., Suite 460
Princeton, NJ 08542

GOLDBERG SEGALLA, LLP                          MEGHAN BROWN, ESQ.
   Counsel for Atlas Painting & Sheeting Corp.
665 Main St.
Buffalo, NY 14203

GLENN T. SUDDABY, Chief United States District Judge

**<u>DECISION and ORDER</u>**

Currently before the Court, in this admiralty action filed by Joshua Friebely ("Plaintiff")

against C.D. Perry & Sons, Inc. ("C.D. Perry"), Finger Lakes Industrial Contracting Corp.

("Finger Lakes"), and Atlas Painting & Sheeting Corp. ("Atlas") (collectively, "Defendants"),

are Defendant Atlas's motion for summary judgment and Defendant C.D. Perry's motion for

summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. Nos. 66, 67.) For the reasons set forth

below, both motions are granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint and Relevant Procedural History

Generally, liberally construed, Plaintiff's Amended Complaint, which was filed on April

29, 2019, alleges that Plaintiff was injured while working as an underwater diver on the

Castleton Bridge Project in the Hudson River in Albany, New York. (Dkt. No. 20, at ¶¶ 22-24.)

Based on this incident, Plaintiff asserts the following five causes of action: (1) a claim for Jones

Act negligence against Defendant Finger Lakes and Defendant C.D. Perry; (2) a claim for

unseaworthiness against Defendant Finger Lakes and Defendant C.D. Perry; (3) a claim for

vessel negligence pursuant to 33 U.S.C. § 905(b) against Defendant Finger Lakes and Defendant

C.D. Perry; (4) a claim for violations of New York Labor Law §§ 200 ("Labor Law § 200") and

241(6) ("Labor Law § 241(6)") against Defendant C.D. Perry; and (5) a claim for violations of

Labor Law §§ 200 and 241(6) against Defendant Atlas. (*Id.* at ¶¶ 21-60.)

On May 30, 2019, Defendant C.D. Perry filed its Answer to Plaintiff's Amended

Complaint and asserted three crossclaims: (1) a crossclaim against Defendant Finger Lakes for

contractual indemnification; (2) a crossclaim against Defendant Finger Lakes and Defendant

Atlas for contribution; and (3) a crossclaim against Defendant Finger Lakes for contractual

insurance indemnification. (Dkt. No. 25, at ¶¶ 73-78.) On June 21, 2019, Defendant Atlas filed

its Answer to Plaintiff's Amended Complaint, and asserted three crossclaims: (1) a crossclaim against Defendant C.D. Perry for contractual indemnification; (2) a crossclaim against Defendant C.D. Perry for contractual insurance indemnification; and (3) a crossclaim against Defendant C.D. Perry and Defendant Finger Lakes for common law indemnification and contribution. (Dkt. No. 30, at ¶¶ 77-86.)[1] On October 19, 2019, Defendant Finger Lakes filed its Answer to Plaintiff's Amended Complaint and the crossclaims that Defendants Atlas and C.D. Perry had asserted against it. (Dkt. No. 38.)

On November 1, 2021, Defendant Atlas and Defendant C.D. Perry each filed their respective motions for summary judgment. (Dkt. Nos. 66-67.) On December 22, 2021, Defendant C.D. Perry, Defendant Finger Lakes, and Plaintiff each filed their respective oppositions to Defendant Atlas's motion. (Dkt. Nos. 72, 73, 75.) That same day, Plaintiff and Defendant Finger Lakes each filed their respective oppositions to Defendant C.D. Perry's motion. (Dkt. Nos. 74, 75.)[2] On January 19, 2022, Defendant C.D. Perry filed a reply to both Plaintiff's and Defendant Finger Lakes' oppositions, and Defendant Atlas also filed a reply in support of its motion. (Dkt. Nos. 77-78, 80.)

### B.  Undisputed Material Facts on Defendant Atlas's Motion for Summary Judgment

The following facts were asserted and supported with accurate record citations by Defendant Atlas in its Statement of Material Facts and either expressly admitted by Plaintiff and

---

[1]      Each party thereafter filed Answers to the crossclaims asserted against them. (Dkt. Nos. 32, 33, 38-41.)

[2]      Defendant Finger Lakes filed one opposition responding to both Defendants' motions for summary judgment. (Dkt. No. 75.)

the other Defendants or denied by them without appropriate record citations in their responses thereto. (*Compare* Dkt. No. 66-17 [Def. Atlas's Rule 56.1 Statement] *with* Dkt. No. 72 [Def. C.D. Perry's Rule 56.1 Response], Dkt. No. 73-20 [Plf's. Rule 56.1 Response] *and* Dkt. No. 75-2 [Defendant Finger Lakes' Rule 56.1 Response].)

1.     On April 29, 2019, Plaintiff commenced this action against Defendant Atlas by filing a Summons and Amended Complaint in the United States District Court for the Northern District of New York. (Dkt. No. 20.)

2.     Plaintiff had previously commenced the action against Defendant C.D. Perry and Defendant Finger Lakes. (Dkt. No. 1.)

3.     Plaintiff seeks to recover damages for personal injuries he sustained on September 8, 2016, while working as a commercial diver for Defendant Finger Lakes on a project at Castleton Bridge in the Hudson River in Albany, New York. (Dkt. No. 20, at ¶¶ 22-24.)

4.     Plaintiff pleaded five causes of action in his Amended Complaint. The first four causes of action are against only Defendant C.D. Perry and Defendant Finger Lakes, not Defendant Atlas. (Dkt. No. 20, at ¶¶ 21-49.)

5.     Only the fifth cause of action is against Defendant Atlas, in which Plaintiff alleges that Atlas was negligent and violated Labor Law §§ 200 and 241(6). (Dkt. No. 20, at ¶¶ 50-60.)

6.     Defendant Atlas filed and served its Answer to the Amended Complaint on June 21, 2019. (Dkt. Nos. 30, 32.)

7.     In its Answer, Defendant Atlas asserted two crossclaims against Defendant C.D. Perry for contractual indemnification and a crossclaim against both Defendant C.D. Perry and Defendant Finger Lakes for common law indemnification. (Dkt. Nos. 30, 32.)

4

8.      Defendant Atlas also denied the crossclaims asserted against it. (Dkt. Nos. 30, 32, 40.)

9.      In its Interrogatories to Plaintiff, Defendant Atlas requested that Plaintiff identify each statute, ordinance, rule, or regulation that he claimed Defendant Atlas had violated, including any Industrial Code violations. (Dkt. No. 66-2, at ¶ 12.)

10.     In response to Defendant Atlas's Interrogatories, Plaintiff asserted that Defendant Atlas violated Labor Law §§ 200 and 241(6). (Dkt. No. 66-2, at ¶ 12.)

11.     On April 15, 2021, pursuant to Fed. R. Civ. P. 26, Plaintiff disclosed James Wright as an expert in construction, job site management, and commercial diving. (Dkt. No. 66-16.)

12.     In his "Opinion Report" attached to the expert disclosure, Wright opines that New York State Industrial Code 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3) were violated. (Dkt. No. 66-16, at 13.)[3]

13.     James Frangos ("Frangos") is the President and co-founder of Defendant Atlas. (Dkt. No. 66-11, at 8.)

14.     Defendant Atlas is an industrial commercial painting contractor. It paints water towers, bridges, and industrial structures. (Dkt. No. 66-11, at 10.)

---

[3]      Defendant C.D. Perry objected to this fact, stating that Wright's opinion report "opines that New York State Industrial Code rules 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3) were violated by *Co-Defendant Finger Lakes*." (Dkt. No. 72-1, at 4.) Although the report certainly implies that Defendant Finger Lakes violated these rules, it does not explicitly state that only Defendant Finger Lakes violated these rules. (Dkt. No. 67-15, at 16 [citing 12 N.Y.C.R.R. 23-1.5(c)(1) and (3) and stating these rules "were both violated," but also addressing the violation of duties and responsibilities by both Defendant C.D. Perry and Defendant Finger Lakes in the surrounding paragraphs of the report].) The Court accordingly leaves the statement as originally drafted.

15.     Castleton Bridge in Albany, New York, carries Interstate 90. It is part of the Berkshire spur and the connection between I-87 and I-90. (Dkt. No. 66-9, at 30.)

16.     Defendant Atlas contracted with the New York State Thruway Authority ("NYS Thruway Authority") for the Castleton Bridge Project. (Dkt. No. 66-3; Dkt. No. 66-11, at 18-19.)

17.     Generally, on the Castleton Bridge Project, Defendant Atlas performed the containment of the structure and abrasive blasting and painting of certain portions of the bridge. (Dkt. No. 66-3; Dkt. No. 66-11, at 10.)

18.     Defendant Atlas worked on the "truss area" of the bridge in the "splash zone" at sidewalk level and up 15-20 feet over three or four spans under the bridge, which was approximately 1,000 feet long. (Dkt. No. 66-11, at 11.)

19.     Frangos testified that Defendant Atlas has performed approximately six jobs with the NYS Thruway Authority. (Dkt. No. 66-11, at 13.)

20.     The contract with the NYS Thruway Authority included some marine construction on the fender system. (Dkt. No. 66-3; Dkt. No. 66-11, at 15-16.)

21.     Defendant Atlas was permitted to subcontract some of the work from the NYS Thruway Authority on the Castleton Bridge Project. (Dkt. No. 66-11, at 74.)

22.     With approval from the State, Defendant Atlas subcontracted with Defendant C.D. Perry for the fender system of the bridge. (Dkt. No. 66-11, at 17.)

23.     Defendant C.D. Perry had a contract with Defendant Atlas. (Dkt. No. 66-4; Dkt. No. 66-9, at 41.)

24.     Section 4.6 of the subcontract between Defendant C.D. Perry and Defendant Atlas reads as follows:

> To the fullest extent permitted by law, the Subcontractor [C.D. Perry] shall indemnify and hold harmless the . . . Contractor [Atlas] . . . from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors [i.e., Finger Lakes], anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caught in part by a party indemnified hereunder.

(Dkt. No. 66-4, at ¶ 4.6.)

25. Additionally, Section 13.4 of the subcontract states that "[t]he Subcontractor shall cause the commercial liability coverage required by the Subcontract Documents to include . . . the Contractor as an additional insured for claims caused in whole or in part by the Subcontractor's negligent acts or omissions during the Subcontractor's completed operations." (Dkt. No. 66-4, at ¶ 13.4.)

26. Defendant C.D. Perry does not employ commercial divers, so any work below the surface on the Castleton Bridge project had to be subcontracted. (Dkt. No. 66-9, at 69.)

27. At the time of the incident underlying this action and at the time of her deposition, Melissa Morganti ("M. Morganti") was the owner and President of Defendant Finger Lakes. (Dkt. No. 66-7, at 5-6.)

28. At the time of the incident underlying this action and at the time of his deposition, Frederick Morganti ("F. Morganti") was the Superintendent of Defendant Finger Lakes. (Dkt. No. 66-7, at 32; Dkt. No. 66-8, at 14.)

7

29.     F. Morganti is a certified commercial diver and a field supervisor. (Dkt. No. 66-7, at 33-34.)

30.     Defendant Finger Lakes does union marine, underwater construction work, including concrete work, pipe installations, timber work, and dock work. (Dkt. No. 66-8, at 14, 16.)

31.     Defendant Finger Lakes does primarily hard hat work in the water. (Dkt. No. 66-8, at 17.)

32.     Defendant Finger Lakes did work on the Castleton Bridge in 2016. (Dkt. No. 66-8, at 17.)

33.     Defendant Finger Lakes was hired to do work on the timber fender area of the Castleton Bridge. (Dkt. No. 66-7, at 29.)

34.     Specifically, Defendant C.D. Perry requested a proposal from Defendant Finger Lakes within the week before Plaintiff's accident on September 8, 2016. (Dkt. No. 66-7, at 31-32; Dkt. No. 66-8, at 18.)

35.     Defendant Finger Lakes was a subcontractor to Defendant C.D. Perry on the Castleton Bridge Project. (Dkt. No. 66-5; Dkt. No. 66-7, at 48-49; Dkt. No. 66-8, at 126-27; Dkt. No. 66-9, at 88-89.)

36.     Defendant C.D. Perry replaced a prior marine contractor on the job with Defendant Finger Lakes. (Dkt. No. 66-10, at 12.)

37.     M. Morganti signed the contract between Defendant Finger Lakes and Defendant C.D. Perry. (Dkt. No. 66-7, at 49.)

8

38.    Defendant Finger Lakes had no direct contract with Defendant Atlas. (Dkt. No. 66-7, at 30, 85; Dkt. No. 66-11, at 103.)

39.    M. Morganti testified that she never saw the contract between Defendant Atlas and the State of New York. (Dkt. No. 66-7, at 78.)

40.    Frangos testified that Defendant Atlas first learned that Defendant C.D. Perry had subcontracted with Defendant Finger Lakes when Defendant Atlas was served with the lawsuit in 2019. (Dkt. No. 66-11, at 94.)

41.    Lance Farrell ("Farrell"), Defendant C.D. Perry's superintendent at the time of Plaintiff's injury, helped to schedule the project. (Dkt. No. 66-10, at 14-15.)[4]

42.    Defendant C.D. Perry was on one end of the bridge installing upper timbers and Defendant Finger Lakes was on the other end of the bridge. They rotated so that they were not working on top of each other. (Dkt. No. 66-10, at 16-17.)

43.    Defendant Finger Lakes had its own supervisor on the project. The superintendent from Defendant C.D. Perry was there for communication between the firms (as necessary). (Dkt. No. 66-9, at 91.)

---

[4]    Defendant C.D. Perry admitted this fact to the extent that its "'scheduling' was limited to discussions regarding general coordination and scheduling of work, which was necessary to keep C.D. Perry's workers and Finger Lakes' workers from interfering with each other, and . . . regarding crane operations bringing materials to the Finger Lakes' crew so [they did not need] to walk through the barges." (Dkt. No. 72-1, at 10.) This specific information regarding the extent of Defendant C.D. Perry's involvement with Defendant Finger Lakes (rather than the general statement that Defendant C.D. Perry's superintendent "helped to schedule the project") is addressed in an undisputed fact from Defendant C.D. Perry's motion for summary judgment.

44.     Tyler Fane ("Fane"), Defendant C.D. Perry's deputy to the Vice President and General Manager at the time of Plaintiff's injury, expected the subcontractor to have competent personnel and suitable equipment. (Dkt. No. 66-9, at 15-16, 119-20.)

45.     The Castleton Bridge had one pier in the water where Defendant Finger Lakes worked. (Dkt. No. 66-13, at 39; Dkt. No. 66-14, at 15.)

46.     Defendant Finger Lakes mobilized work two days before the accident, which included shipping in a Conex dive box containing two radios, dive hoses, dive helmets, an air compressor, deck whips that connect the compressor to the volume tank, emergency air, and first aid kits. (Dkt. No. 66-8, at 41-42.)

47.     Defendant Finger Lakes' work on the Castleton Bridge Project involved the fender system around the pier of the bridge that was in the water. (Dkt. No. 66-14, at 14-15.)

48.     Defendant Finger Lakes installed horizontal timbers underwater and used Defendant C.D. Perry's barge as a platform. (Dkt. No. 66-8, at 19-21, 27, 37; Dkt. No. 66-10, at 26; Dkt. No. 66-13, at 38.)

49.     Defendant C.D. Perry was working above the water, and Defendant Finger Lakes was working below the water. (Dkt. No. 66-7, at 53; Dkt. No. 66-8, at 127; Dkt. No. 66-10, at 17; Dkt. No. 66-13, at 158; Dkt. No. 66-14, at 24, 35; Dkt. No. 66-15, at 74-75.)

50.     Defendant Finger Lakes supplied its own dive equipment and dive compressors. (Dkt. No. 66-8, at 21; Dkt. No. 66-13, at 161.)

51.     Defendant Finger Lakes had a five-man dive team, which included two divers in the water, two tenders, and a communications operator. (Dkt. No. 66-10, at 62; Dkt. No. 66-8, at 20.)

52.     Defendant Finger Lakes' dive crew on September 8, 2016 (i.e., the date of Plaintiff's accident and injury) included Plaintiff, Tim Compton ("Compton"), Tony Clayberger ("Clayberger"), Jeff Hoffman ("Hoffman"), and Eric Wood ("Wood"). They were all employees of Defendant Finger Lakes. (Dkt. No. 66-6, at 148, 247, 251; Dkt. No. 66-8, at 39-41; Dkt. No. 66-12, at 89; Dkt. No. 66-14, at 11-12.)

53.     F. Morganti was the supervisor that day. (Dkt. No. 66-8, at 40.)

54.     Hoffman was operating the communication radio and keeping job notes. (Dkt. No. 66-8, at 40-41, 69; Dkt. No. 66-12, at 40-41, 61; Dkt. No. 66-13, at 79-80.)

55.     Clayberger and Plaintiff were divers, and Compton and Wood were dive tenders. (Dkt. No. 66-6, at 147-48; Dkt. No. 66-8, at 39-41; Dkt. No. 66-12, at 40; Dkt. No. 66-13, at 73, 79-80.)

56.     Clayberger was the lead diver. (Dkt. No. 66-6, at 148; Dkt. No. 66-13, at 37; Dkt. No. 66-14, at 41.)

57.     The tenders are there to assist the diver, providing whatever the diver needs, including delivery of tools. (Dkt. No. 66-14, at 29; Dkt. No. 66-15, at 30.)

58.     Only employees of Defendant Finger Lakes performed work using the hydraulic drill. (Dkt. No. 66-13, at 162.)

59.     The divers performed the construction work with the drills and the timbers. (Dkt. No. 66-14, at 29.)

60.     The air hose and communication cable are part of what is called the "umbilical." (Dkt. No. 66-14, at 30.)

61.     The dive tender also helps with the umbilical by pulling up the slack and ensuring it does not get tangled. (Dkt. No. 66-14, at 30.)

62.     On the date of the accident, Defendant Finger Lakes' work involved installing bolts and timbers. (Dkt. No. 66-14, at 40.)

63.     Defendant Finger Lakes owned the radios used by the divers on the Castleton Bridge Project. (Dkt. No. 66-8, at 48.)

64.     Defendant Finger Lakes had one person who handled the communication between the topside workers and the in-water workers. (Dkt. No. 66-10, at 59-60.)

65.     The divers have headsets in their dive helmets. The communications operator hits a switch to talk to one diver and then hits a different switch to speak with the other diver. (Dkt. No. 66-10, at 59-60; Dkt. No. 66-14, at 26-27.)

66.     The radios did not have the capacity for the two underwater divers to speak directly to each other. (Dkt. No. 66-8, at 52.)

67.     There is a different system, known as a four-wire system, which permits such communication. (Dkt. No. 66-8, at 52-53.)

68.     Direct communication between the divers is known as "crosstalk." (Dkt. No. 66-8, at 53.)

69.     F. Morganti testified that having a crosstalk capacity in the radio system is not safer because it is a potential distraction to the person operating the tools and there is confusion between who is receiving what instruction. (Dkt. No. 66-8, at 55-56, 60-61.)[5]

---

[5]     In his response to this statement, Plaintiff reiterates his position that "communication directly between divers [is] safe[r]" than the system Defendant Finger Lakes had in place. (Dkt. No. 73-20, at 21.) Plaintiff provides the same statement in response to various other statements

70.     According to F. Morganti, all communications should be funneled through one person. (Dkt. No. 66-8, at 56.)

71.     On the day of Plaintiff's injury, there was a designated communications operator. (Dkt. No. 66-14, at 27.)

72.     Before the incident, the radios were tested to make sure they were working properly. (Dkt. No. 66-8, at 110.)[6]

73.     While diving, Plaintiff communicated with Hoffman, who was operating the communications topside, through a two-wire communication system in his helmet. (Dkt. No. 66-6, at 159-61.)

74.     Prior to his injury, Plaintiff never had any issues with the communication system in his dive helmet. (Dkt. No. 66-6, at 161.)

75.     Plaintiff's helmet communication was working. (Dkt. No. 66-6, at 166.)

76.     Plaintiff and Clayberger could not speak to each other directly through the communication system. (Dkt. No. 66-6, at 165.)

_____

of fact asserted by Defendant Atlas. The Court notes that Plaintiff disagrees with F. Morganti's opinion, but the statement is admitted as an undisputed fact because Plaintiff admits F. Morganti testified this way, and because the statement is supported by a record citation. (Dkt. No. 66-8, at 55-56, 60-61.)

[6]     Defendant Atlas also asserts that the test verified that the radios were working properly. Plaintiff challenges whether the radios worked properly, citing both his and Compton's deposition testimony. (Dkt. No. 73-20, at 21; Dkt. No. 73-21, at 27 [agreeing that the radios were tested but contesting whether they worked properly].) Plaintiff reiterates this challenge in response to multiple statements in Defendant Atlas's Statement of Facts. Based on the record support for Plaintiff's objection, the Court does not include as an undisputed fact that the radios actually worked properly on the day of the incident.

77.     There was one dive box with a two-way system. Hoffman could speak to each of the two divers, but they could not speak to each other. (Dkt. No. 66-6, at 164.)

78.     Clayberger testified that he personally had no problem with his communications. (Dkt. No. 66-13, at 113.)

79.     Clayberger testified that the communications "were absolutely fine." (Dkt. No. 66-13, at 113-14.)

80.     Plaintiff testified that the communications were "shoddy" and gave feedback. (Dkt. No. 66-6, at 177-78.)

81.     On the day of the accident, Hoffman was assigned to the radio. (Dkt. No. 66-12, at 61, 79.)

82.     In the radio room, Hoffman was taking notes, watching the gauges, making sure the divers had air, and cleaning tools. (Dkt. No. 66-12, at 61, 87.)

83.     Hoffman was the only person who would have communicated with the divers through the radio. (Dkt. No. 66-12, at 69.)

84.     As Hoffman testified, if Clayberger was doing something and needed Plaintiff's help or assistance, Hoffman would tell Plaintiff that Clayberger needed help. Plaintiff and Clayberger could either communicate through hand signals, or Clayberger would give Hoffman a description of what he needed, and Hoffman could relay it to the other diver. (Dkt. No. 66-12, at 73.)

85.     Hoffman testified that he listened to the radio by speaker and had the ability to hear from two different speakers if two communication units were working. (Dkt. No. 66-12, at 94-95.)

14

86.     Hoffman testified that he must cue the microphone for the divers to hear him, meaning he has to push a button to talk. If he is not pushing the button, then the divers cannot hear anything topside from Hoffman. (Dkt. No. 66-12, at 94-95.)

87.     Hoffman did not have to adjust the volumes of the radios. He would listen to one diver and say, "got it," and then relay the information to the other diver. (Dkt. No. 66-12, at 73.)

88.     Hoffman testified that the communication boxes "were working great" and that he could "hear everything just fine." (Dkt. No. 66-12, at 74.)

89.     Hoffman testified that there was no feedback or squelch when using the communications boxes, and that he did not notice divers' voices dropping out (which would require him to reset the equipment). (Dkt. No. 66-12, at 74.)

90.     Hoffman testified that he did not recall any complaints about the communications equipment. (Dkt. No. 66-12, at 75-76.)

91.     Hoffman testified that he did not think it would be any safer to use a system where divers could communicate to each other because it would be distracting. (Dkt. No. 66-12, at 83.)

92.     Plaintiff was working for Defendant Finger Lakes as a diver on the Castleton Bridge Project on the date of his accident. (Dkt. No. 66-6, at 23, 29, 140, 222.)

93.     Plaintiff was injured on his second day on the job. (Dkt. No. 66-6, at 143; Dkt. No. 66-12, at 39.)

94.     On the day of the accident, Plaintiff and Clayberger were correcting the installation of a timber from the day before. They performed this correction in the morning and then moved on to other items. (Dkt. No. 66-8, at 71; Dkt. No. 66-13, at 80.)

15

95.     Clayberger testified about the process for attaching the horizontal timbers and using the drill. (Dkt. No. 66-13, at 47-48.)

96.     This was a standard job for a commercial diver. (Dkt. No. 66-13, at 50-51.)

97.     The dive station was on the barge. The divers would climb down to a float stage and then into the water. (Dkt. No. 66-6, at 152.)

98.     The barge belonged to Defendant C.D. Perry. (Dkt. No. 66-12, at 158; Dkt. No. 66-14, at 24.)

99.     During Plaintiff's first dive on September 8, 2016, he was setting measurements for timbers to be used as bracing. (Dkt. No. 66-6, at 150-51.)

100.    During that first dive, Clayberger drilled timber bracing and used a hydraulic drill. (Dkt. No. 66-6, at 151.)

101.    During the morning dive, Plaintiff used a chainsaw. He did not use any hydraulic tools during the afternoon dive. (Dkt. No. 66-6, at 154-56, 158, 161.)

102.    During the afternoon dive, Clayberger used the drill. (Dkt. No. 66-6, at 155; Dkt. No. 66-8, at 87; Dkt. No. 66-13, at 83.)

103.    Plaintiff knew Clayberger was using the drill during that afternoon dive. (Dkt. No. 66-6, at 155.)

104.    The drill was a hydraulic drill with a four-foot augur bit, approximately one inch in diameter with a screw top. (Dkt. No. 66-6, at 155; Dkt. No. 66-8, at 112; Dkt. No. 66-10, at 60; Dkt. No. 66-14, at 23-24.)

105.     One safety practice that everyone is supposed to follow is for everyone to be told that a worker in the water was going to be using a power tool and that it was going "hot" (i.e., it was going to be energized). (Dkt. No. 66-10, at 61.)

106.     F. Morganti testified that a diver is not cleared to operate anything or to make a tool "hot" (or energized) until the tender authorizes him. The tender does not authorize anyone to do anything until the second diver (or even the primary diver) verify that he is clear of any obstructions, including hoses and the other diver. (Dkt. No. 66-8, at 55.)

107.     During the afternoon dive, one of Plaintiff's tasks was to push bolts through the holes Clayberger drilled. (Dkt. No. 66-6, at 155-56, 158; Dkt. No. 66-13, at 85.)

108.     When Plaintiff arrived at the first pile to place bolts in the holes, he could not see Clayberger in the water. (Dkt. No. 66-6, at 163.)

109.     Plaintiff testified that he was following Clayberger's path. (Dkt. No. 66-6, at 163.)

110.     Compton testified that, on the day of the accident, Plaintiff and Clayberger were working together on the crosspieces. (Dkt. No. 66-14, at 42, 83.)

111.     Plaintiff testified that, between getting the last bolt and being injured, he had a discussion with Hoffman in which Hoffman told him that Clayberger was drilling somewhere in one of the pile bents. (Dkt. No. 66-6, at 168.)

112.     Plaintiff testified that, at the point Hoffman told him that Clayberger may be close to him, Plaintiff was not concerned because "everywhere [he] was putting in bolts and there were holes, [he] knew around [him] [they] already did the work" and that "[he] knew [he] was most likely safe there." (Dkt. No. 66-6, at 168-69.)

113.    Clayberger testified that he felt Plaintiff was in a safe location. (Dkt. No. 66-13, at 135.)

114.    Plaintiff testified that, when he went back underwater to tidy up his work for the next day, he became injured. (Dkt. No. 66-6, at 171.)

115.    According to Plaintiff, he and Clayberger were diving at approximately the same depth. (Dkt. No. 66-6, at 172.)

116.    Plaintiff testified that he came up to the halfway mark, had his legs on the pile and his hand on a cross-member waiting for the tender to take up his umbilical, when his hand was struck by the drill Clayberger was operating. (Dkt. No. 66-6, at 174-77, 188-90.)[7]

117.    Plaintiff was never asked where he was. (Dkt. No. 66-6, at 205.)

118.    When Plaintiff began climbing the pile, he did not ask anyone how far away Clayberger was. (Dkt. No. 66-6, at 177.)

119.    When Plaintiff ascended halfway and stopped, he did not think Clayberger was nearby. (Dkt. No. 66-6, at 179.)

120.    When Plaintiff was ascending, he asked what Clayberger was doing, but he did not ask where Clayberger was located. (Dkt. No. 66-6, at 180-81.)

---

[7]     The Court notes that the location of Plaintiff's hand at the time of the injury is in dispute because other individuals testified that his hand was in a gap in the wood pile. (Dkt. No. 66-13, at 106 ["I was drilling through a pile, and his hand was in between the cross member of the pile."]; Dkt. No. 66-8, at 113-14, 119.) However, this fact is admitted because it references how Plaintiff testified, which is supported by the record cite to his deposition.

121.     Once Plaintiff's hand was struck, he yelled "all stop" through the communication system to Hoffman, who was topside. Hoffman communicated that message to Clayberger, who stopped and ultimately removed the drill from Plaintiff's hand. (Dkt. No. 66-6, at 190-93.)

122.     Compton learned Plaintiff had been injured when he saw Plaintiff's hand come out of the water and that it was bleeding. (Dkt. No. 66-14, at 47-48, 53.)

123.     The tenders assisted Plaintiff out of the water and into the float following the injury. (Dkt. No. 66-8, at 97; Dkt. No. 66-14, at 55-56.)

124.     There was no defect in the drill. (Dkt. No. 66-15, at 74.)

125.     The barge had nothing to do with the accident. (Dkt. No. 66-15, at 74.)[8]

126.     Clayberger and Hoffman testified that they believed Plaintiff caused himself to be injured on purpose. (Dkt. No. 66-8, at 106-08; Dkt. No. 66-12, at 55.)

127.     Clayberger testified that there was no equipment defect that caused the accident. (Dkt. No. 66-13, at 162-63.)

128.     Compton testified that he did not hear any communication between Hoffman and Clayberger prior to the accident and does not know what, if anything, was said to Clayberger in the minutes before the accident.  (Dkt. No. 66-14, at 61, 92.)

129.     Frangos testified that the subcontractors were responsible for their own safety on the job. (Dkt. No. 66-11, at 38-40, 43-44, 83.)

---

[8]     In response to this statement, Plaintiff stated that "[t]he vessel itself did not cause the accident." (Dkt. No. 73-20, at 32.) Plaintiff did not admit or deny Defendant Atlas's proposed fact, nor did he include a record citation to support his statement. (*Id.*) The Court therefore deems this fact as admitted.

130.    Defendant Atlas did not supervise Defendant C.D. Perry's workers or inspect its work. (Dkt. No. 66-11, at 45-46, 63.)

131.    F. Morganti was on the barge on the day of the injury. (Dkt. No. 66-8, at 70.)

132.    F. Morganti had no communication with anyone from Defendant Atlas on the project and was not aware of anyone from Defendant Finger Lakes communicating with anyone from Defendant Atlas. (Dkt. No. 66-8, at 129.)

133.    F. Morganti never saw anyone from Defendant Atlas at the dive site. (Dkt. No. 66-8, at 129.)

134.    Plaintiff never had any contact with anyone from Defendant Atlas. (Dkt. No. 66-6, at 12, 212, 217-19, 245.)

135.    Plaintiff did not receive any direction or instruction from Defendant Atlas. (Dkt. No. 66-6, at 245.)

136.    The only people working underwater were employees of Defendant Finger Lakes. (Dkt. No. 66-6, at 245-46.)

137.    Defendant Atlas did not provide Plaintiff with any equipment. (Dkt. No. 66-6, at 247.)

138.    Defendant Atlas did not provide any training to Defendant Finger Lakes. (Dkt. No. 66-7, at 86; Dkt. No. 66-9, at 124-25; Dkt. No. 66-10, at 57.)

139.    Defendant Atlas did not provide any equipment to Defendant Finger Lakes. (Dkt. No. 66-7, at 86; Dkt. No. 66-9, at 124-25; Dkt. No. 66-10, at 57.)

140.    Defendant Finger Lakes was responsible for supervising its own work and directing and controlling the divers. (Dkt. No. 66-9, at 124-25; Dkt. No. 66-14, at 113.)

141.    No one from Defendant Finger Lakes had any written or verbal communication with Defendant Atlas. (Dkt. No. 66-7, at 85-86; Dkt. No. 66-14, at 114.)

142.    Defendant Atlas did not control the means, the manner, or the method of Defendant Finger Lakes' work. (Dkt. No. 66-9, at 124-25; Dkt. No. 66-10, at 57.)

143.    Defendant Finger Lakes directed and controlled its own underwater diving work. (Dkt. No. 66-13, at 159.)

144.    Defendant Atlas did not give anyone at Defendant Finger Lakes any directions, instructions, or other guidance concerning its performance on the project. (Dkt. No. 66-11, at 103.)

145.    Defendant Atlas did not provide any documents to Defendant Finger Lakes. (Dkt. No. 66-11, at 103-04.)

146.    Defendant Atlas did not review Defendant Finger Lakes' work. (Dkt. No. 66-11, at 104.)

147.    There were no complaints made to Defendant Atlas about Defendant Finger Lakes. (Dkt. No. 66-9, at 125; Dkt. No. 66-10, at 57; Dkt. No. 66-11, at 104.)

## C.    Undisputed Material Facts on Defendant C.D. Perry's Motion for Summary Judgment

The following facts were asserted and supported with accurate record citations by Defendant C.D. Perry in its Statement of Material Facts and either expressly admitted by Plaintiff and the other Defendants or denied by them without appropriate record citations in their responses thereto. (*Compare* Dkt. No. 67-2 [Def. C.D. Perry's Rule 56.1 Statement] *with* Dkt. No. 74-20 [Plf.'s Rule 56.1 Response] *and* Dkt. No. 75-1 [Def. Finger Lakes' Rule 56.1 Response.])

21

1.      NYS Thruway Authority awarded Defendant Atlas the project involving the
rehabilitation of the Castleton Bridge on the Hudson River. (Dkt. No. 67-3; Dkt. No. 67-9, at 24-
26; Dkt. No. 67-13, at 17-21.)

2.      Pursuant to its accepted bid proposal and letter from the NYS Thruway Authority
dated February 27, 2015, Defendant Atlas agreed to provide to the NYS Thruway Authority the
general construction services for the project. (Dkt. No. 67-13, at 26-27, 38-40.)

3.      The project's scope of work included replacement of the Castleton Bridge's
fender systems, which are wooden, pier-like structures that surround a bridge's mid-river
stanchion to protect it in the event of collision with shipping. (Dkt. No. 67-9, at 24; Dkt. No. 67-
13, at 17-20, 24-25.)

4.      Replacement of the fender system required waterborne woodwork both above and
below the waterline of the Hudson River. (Dkt. No. 67-9, at 24-25; Dkt. No. 67-13, at 17-20, 24-
25; Dkt. No. 67-6, at 26-27.)

5.      Defendant Atlas subcontracted the waterborne woodwork to Defendant C.D.
Perry pursuant to AIA Standard Form Agreement between Contractor and Subcontractor dated
November 24, 2015. (Dkt. No. 67-3; Dkt. No. 67-13, at 46, 76-79.)

6.      Because Defendant C.D. Perry did not employ certified divers, they subcontracted
the project's underwater woodwork to Defendant Finger Lakes, who took over the contract work
from another marine construction company, pursuant to a subcontract agreement dated
September 6, 2016. (Dkt. No. 67-4; Dkt. No. 67-9, at 69-70, 76; Dkt. No. 67-6, at 17-21, 26-27,
127; Dkt. No. 67-7, at 29-32, 35-36, 74-75.)

7.     Defendant Finger Lakes' subcontract required it to perform all underwater timber restoration work at the project, while Defendant C.D. Perry performed its own timber restoration work above the waterline. Defendant C.D. Perry did not provide continuous direction or general supervision over Defendant Finger Lakes. (Dkt. No. 67-9, at 90-91, 124-25; Dkt. No. 67-6, at 30; Dkt. No. 67-7, at 36-37, 51-52.)

8.     Defendant C.D. Perry performed all project-related timber restoration and replacement work above the Hudson River waterline, while Defendant Finger Lakes performed all underwater timber restoration and replacement work from September 6, 2016, through September 8, 2016. (Dkt. No. 67-8, at 16-17; Dkt. No. 67-6, at 30, 39, 127; Dkt. No. 67-11, at 31-38, 46-47.)

9.     Defendant Finger Lakes provided its own dive equipment (including radio communication equipment) necessary to complete the underwater timber restoration work. Defendant C.D. Perry did not inspect Defendant Finger Lakes' equipment. (Dkt. No. 67-9, at 119-20; Dkt. No. 67-6, at 21; Dkt. No. 67-5, at 56; Dkt. No. 67-8, at 29.)

10.     Defendant C.D. Perry owned and/or provided the barge used by Defendant Finger Lakes as a staging area for its underwater restoration work, the float located adjacent to the barge that Defendant Finger Lakes used to get in and out of the Hudson River to perform the underwater timber restoration work, and the crane and crane operator used to bring materials to Defendant Finger Lakes. Defendant C.D. Perry may have provided Defendant Finger Lakes with some power tools, such as a drill and drill bits, but that is unclear from the testimony. (Dkt. No. 67-8, at 18-19, 27; Dkt. No. 67-6, at 42-43.)

11.     Defendant Finger Lakes' dive tenders, supervisor, and communications operator worked from their Conex container where they kept their equipment (which was located on Defendant C.D. Perry's barge) and from the float. (Dkt. No. 67-6, at 39-42.)

12.     Defendant Finger Lakes began its work at the project on or about September 6, 2016, by mobilizing its Conex container and dive equipment on the barge. The Conex container contained Defendant Finger Lakes' communications equipment. (Dkt. No. 67-6, at 42; Dkt. No. 67-5, at 260, 264-65.)

13.     Defendant Finger Lakes and its employees provided their own underwater diving equipment for the project, which included divers' radio-equipped helmets, two-way radios, dive hoses, an air compressor, dive whips, first-aid kits, and their own hand tools. Defendant Finger Lakes tested its own equipment. Plaintiff signed a document certifying his personal equipment had been operational. (Dkt. No. 67-6, at 21, 44-48, 63; Dkt. No. 67-5, at 56-57, 160, 230, 260.)

14.     On September 8, 2016, Defendant Finger Lakes' crew at the project consisted of the following employees: F. Morganti as supervisor; Clayberger as lead diver; Plaintiff as diver; Woods and Compton as diver tenders; and Hoffman as the diver tender responsible for operating the radio communications. (Dkt. No. 67-6, at 40; Dkt. No. 67-11, at 13.)

15.     From the start of their work at the project up until Plaintiff's injury, Defendant Finger Lakes' crewmembers directed, controlled, supervised, performed, and carried out all labor necessary to complete the underwater timber restoration work in accordance with the terms of the subcontract between Defendant C.D. Perry and Defendant Finger Lakes. Plaintiff never communicated with anyone from Defendant C.D. Perry. All communication during the dive was

with Defendant Finger Lakes' dive tender, Hoffman. (Dkt. No. 67-5, at 159-61, 165-69, 212, 245-46; Dkt. No. 67-11, at 79-105.)[9]

16.     Before operating a piece of equipment (such as a drill), divers were required to communicate with Defendant Finger Lakes' radio operator. F. Morganti testified that he did not know whether Plaintiff had been properly warned that his diving partner was about to use a drill. (Dkt. No. 67-6, at 76-78, 98-99, 103; Dkt. No. 67-11, at 81-82.)

17.     F. Morganti and Clayberger (of Defendant Finger Lakes) directed and supervised Plaintiff's work at the project. F. Morganti was on the barge when the accident occurred. (Dkt. No. 67-5, at 148; Dkt. No. 67-6, at 88; Dkt. No. 66-14, at 48-52.)

18.     From the start of their work at the project up until Plaintiff's injury, Defendant Finger Lakes was responsible for and performed all radio communication between and among its crewmembers. (Dkt. No. 67-6, at 46-61, 103, 110; Dkt. No. 67-5, at 159-169, 213.)

---

[9]     Plaintiff responded to the first sentence in this statement by admitting it in part and denying it in part but not specifically identifying which portion of the statement he admitted or denied. Rather, he stated that "Morganti and Farrell and Hoffman and Clayberger testified that Finger Lakes coordinated work with C.D. Perry in the mornings, and the crane operator using C.D. Perry's crane, hoisted materials for Finger Lakes." (Dkt. No. 74-20, at 5.) Plaintiff did not include any record citation as support for his denial. (*Id.*) In his "Rule 56.1(b) Statement of Material Facts About Which Either There Are No Issue or Contest, or Those, as Indicated, In Which There is A Dispute," Plaintiff also stated that "[t]he underwater work was directly controlled by Finger Lakes," even though the following paragraph states that "C.D. Perry would 'control' the work flow, including where Finger Lakes worked, thus, some of the underwater work could be attributed to C.D. Perry's indirect control." (Dkt. No. 73-21, at 25.) Based on Plaintiff's unclear response (with no record citations) to Defendant C.D. Perry's statement, Plaintiff's and Defendant Finger Lakes' admission of the fact, the record citations provided by Defendant C.D. Perry supporting its statement, and the later statement of undisputed fact regarding Defendant C.D. Perry's role in scheduling, the Court deems this fact admitted.

19.     Defendant Finger Lakes held pre-dive safety meetings that its crewmembers were required to attend and/or the crewmembers completed and signed their own pre-dive safety reports, including one such report Plaintiff signed on the morning of his injury. (Dkt. No. 67-6, at 63-66; Dkt. No. 67-5, at 145-48.)

20.     Defendant C.D. Perry did not supervise, inspect, direct, or control Plaintiff or his coworkers, or the means and methods used by Defendant Finger Lakes' crewmembers to complete their underwater timber restoration work at the project. Plaintiff received no instruction from Defendant C.D. Perry and had no communication with anyone associated with it. Defendant Finger Lakes' communication with Defendant C.D. Perry at the project was generally limited to discussions regarding general coordination and scheduling of work, which was necessary to keep Defendant C.D. Perry's workers and Defendant Finger Lakes' workers from interfering with each other, as well as crane operations that were necessary to bring materials and items to Defendant Finger Lakes' crew so that they would not need to walk through the barges. (Dkt. No. 67-8, at 14-19, 46-48; Dkt. No. 67-7, at 29-31, 52-53; Dkt. No. 67-11, at 156-59, 164-65; Dkt. No. 67-13, at 6, 103-04; Dkt. No. 67-6, at 127-128; Dkt. No. 67-5, at 212, 222-23; Dkt. No. 67-9, at 124-125.)

21.     Other communication between Defendants C.D. Perry and Finger Lakes concerned where materials were to go, work progress, and barge movement (when required). (Dkt. No. 67-8, at 45-48.)

22.     On September 8, 2016, Plaintiff and Clayberger had been working together underwater while under the instruction, general supervision, and direction of F. Morganti. Earlier

in the day, Plaintiff had received his instructions from Clayberger because F. Morganti had not been present. (Dkt. No. 67-6, at 40, 88; Dkt. No. 67-11, at 148, 159.)

23.     While underwater, Plaintiff and Clayberger were unable to communicate with each other directly and unable to communicate directly with their supervisor or the other dive tenders. They communicated only with Hoffman because it was Defendant Finger Lakes' custom and practice not to allow crosstalk communication between divers and dive tenders. (Dkt. No. 67-7, at 51-57; Dkt. No. 67-5, at 159-61, 165-69, 214; Dkt. No. 67-8, at 59-61; Dkt. No. 66-17.)

24.     Plaintiff has alleged that, while in the process of surfacing, he received radio instruction from Hoffman to stop moving. Plaintiff claims he followed those instructions and stayed at an underwater wood pile. (Dkt. No. 67-5, at 175-77.)

25.     Clayberger had been drilling at that moment, and the drill bit contacted Plaintiff's hand, causing his injury. (Dkt. No. 67-5, at 174-77, 257-58; Dkt. No. 67-11, at 105-06, 113-14, 123.)

26.     Although Clayberger could see Plaintiff's legs, he could not see where Plaintiff had his hands because of low visibility in the Hudson River (caused in part by his drilling). Clayberger was approximately five feet from Plaintiff. (Dkt. No. 67-5, at 161-66; Dkt. No. 109-10, 113-14.)

27.     Plaintiff testified that he did not receive information from Hoffman at the moment that Clayberger drilled a hole into the wood pile. (Dkt. No. 67-5, at 168-69, 213-17.)

28.     On the day of the accident, Farrell and six to ten other Defendant C.D. Perry workers were working from another barge approximately 300-feet away from Defendant Finger Lakes' crew (with the exception of the boom lift operator). (Dkt. No. 67-8, at 29-32.)

27

29.     None of Defendant Finger Lakes' crew reported (or could recall at their depositions) a problem or deficiency with the barge, float, crane, drill, or drill bits used by them in the two days they worked at the project before Plaintiff was injured. However, Plaintiff claims he did complain to his supervisor that he wanted a different drill bit but did not receive one. (Dkt. No. 67-5, at 216-17, 230-31.)

30.     None of Defendant Finger Lakes' crew reported any deficiencies in the barge, float, crane, drill, or drill bits owned by Defendant C.D. Perry that were in use when Plaintiff's injury occurred. When a drill needed repair, Defendant Finger Lakes performed the repair. (Dkt. No. 67-6, at 103; Dkt. No. 67-11, at 162.)

31.     None of Defendant Finger Lakes' crew noted, recalled, or reported an act or omission by Defendant C.D. Perry that contributed to Plaintiff's injury. (Dkt. No. 67-6, at 101-105, 110.)

32.     No one from Defendant C.D. Perry was made aware that Defendant Finger Lakes' dive equipment, including their radio communications equipment, was allegedly inadequate, problematic, deficient, or otherwise improper for the underwater construction work required of Defendant Finger Lakes by their subcontract with Defendant C.D. Perry. (Dkt. No. 67-6, at 103, 110.)

33.     Paragraph 3.7 of the subcontract agreement between Defendant C.D. Perry and Defendant Finger Lakes contains an indemnification provision. (Dkt. No. 67-4, at ¶¶ 3.7-3.8.)

34.     Pursuant to the terms of their subcontract agreement, Defendant Finger Lakes was obligated to procure insurance and to add Defendant C.D. Perry as an additional insured. (Dkt. No. 67-4, at ¶¶ 3.7-3.8.)

C.     **Plaintiff's N.D.N.Y. L.R. 56.1(b) Statement of Additional Material Facts in Dispute**

Along with filing his Rule 56.1 Responses to Defendant Atlas's and Defendant C.D. Perry's Rule 56.1 Statements, Plaintiff also filed a "Rule 56.1(b) Statement of Material Facts About Which Either There Are No Issues or Contest, Or Those, As Indicated, In Which There is a Dispute." (Dkt. Nos. 73-21, 74-21.) Local Rule 56.1(b) provides that "the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts in Dispute, containing separately numbered paragraphs, followed by a citation to the record where the fact is established." N.D.N.Y. L.R. 56.1(b).

To the extent Plaintiff's filings attempt to establish undisputed facts (i.e., "material facts about which either there are no issues or contest"), the Court notes that Plaintiff has no basis, nor need, for attempting to establish these facts because Plaintiff did not move for summary judgment. N.D.N.Y. L.R. 56.1; Fed. R. Civ. P. 56. Further, the Court emphasizes that the relevant local rule allows "a *short and concise* Statement of *Additional Material* Facts in Dispute," which is different than Plaintiff's 33-page document restating the same information and record citations that he included (or admitted to) in his Responses, as well as over 35 sections from the contracts at issue in this case. N.D.N.Y. L.R. 56.1(b) (emphasis added). (Dkt. Nos. 73-21, 74-21.) In the rare instances in which Plaintiff's Statement of Additional Material Facts has raised novel or relevant factual issues not discussed in the Rule 56.1 Statements and Responses, the Court has addressed those issues above in Parts I.B. and I.C. of this Decision and Order.

D.     **Parties' Briefing on the Pending Motions**

### 1. Defendant Atlas's Motion for Summary Judgment

### a. Defendant Atlas's Memorandum of Law

Generally, in support of its motion for summary judgment, Defendant Atlas sets forth

three arguments. (Dkt. No. 66-18.)

First, Defendant Atlas argues that it is entitled to summary judgment on Plaintiff's

common law negligence and Labor Law § 200 claims. (*Id.* at 7-10.) More specifically, Defendant

Atlas argues that, because Defendant Finger Lakes' performance of its work caused Plaintiff's

injury, Defendant Atlas can be liable only if it had the authority to control that activity. (*Id.* at 7-

8.) Defendant Atlas argues that the Court must dismiss Plaintiff's negligence and Labor Law §

200 claims for the following three reasons: (1) Defendant Atlas did not, and had no authority to,

direct or control Plaintiff's work or the work of any of Defendant Finger Lakes' employees; (2)

Defendant Atlas did not provide any training or equipment to Defendant Finger Lakes'

employees; and (3) Defendant Atlas did not communicate with any of Defendant Finger Lakes'

employees. (*Id.* at 8.) Defendant Atlas further argues that the Court cannot find it liable under

Labor Law § 200 for any allegedly dangerous or defective condition on the worksite because it

did not have notice of the condition or an opportunity to act. (*Id.* at 9.)

Second, Defendant Atlas argues that it is entitled to summary judgment on Plaintiff's

Labor Law § 241(6) claim. (*Id.* at 10-15.) More specifically, Defendant Atlas argues that 12

N.Y.C.R.R. § 23-1.5(c)(1)—one of the Industrial Code sections upon which Plaintiff relies—is

too general to serve as a predicate for his Labor Law § 241(6) claim. (*Id.* at 10-11.) Defendant

Atlas further argues that the Court should dismiss Plaintiff's Labor Law § 241(6) claim

predicated on a violation of 12 N.Y.C.R.R. § 23.15(c)(3) because neither Plaintiff nor Clayberger

used defective equipment at the time of the accident. (*Id.* at 12.) Defendant Atlas argues that, to the extent the radios or communication devices Defendant Finger Lakes used at the time of the accident were not sound and operable (which Defendant Atlas disputes), any alleged deficiency was not the proximate cause of Plaintiff's accident. (*Id.* at 12-13.) Defendant Atlas argues that the alleged deficiencies with the radio communications equipment did not cause Plaintiff's accident or injury because there was no communication about Plaintiff's or Clayberger's location prior to impact with the drill. (*Id.* at 13.) Defendant Atlas argues that, although certain alleged failures in communication may have caused or contributed to the accident, they were not the result of a violation of this particular Industrial Code regulation, and Defendant Atlas therefore cannot be liable under Labor Law § 241(6). (*Id.* at 13-14.)

Defendant Atlas also argues that, even if the radio communications equipment were not "sound and operable" and contributed to Plaintiff's accident, Defendant Atlas cannot be held liable under Labor Law § 241(6) because it did not have notice of the condition so that it could "immediately repaire[] or restore[] or immediately remove[]" the allegedly defective equipment from the job site. (*Id.* at 14-15.)

Third, Defendant Atlas argues that it is entitled to summary judgment on its crossclaim against Defendant C.D. Perry for contractual indemnification. (*Id.* at 15-20.) More specifically, Defendant Atlas argues that the clear and unambiguous language of the indemnification provision in its contract with Defendant C.D. Perry shows that Defendant C.D. Perry intended to defend and indemnify Defendant Atlas. (*Id.* at 17.) Defendant Atlas argues that there is no dispute that Plaintiff's accident and alleged damages arose out of or resulted from the work Defendant Atlas subcontracted to Defendant C.D. Perry (who then subcontracted to Defendant

31

Finger Lakes), and therefore is covered by the indemnification provision. (*Id.* at 17-18.)

Defendant Atlas further argues that the Court may render a conditional judgment on the issue of

indemnification, pending determination of the primary action, so that Defendant Atlas may

obtain the earliest possible determination as to the extent to which it can expect reimbursement.

(*Id.* at 18.) Defendant Atlas argues that where, as here, it may be held liable only by virtue of

statutory or vicarious liability (and not negligence), Defendant Atlas is entitled to full defense

and indemnification from Defendant C.D. Perry, or, alternatively, a conditional order of defense

and indemnification pending the outcome of the underlying lawsuit. (*Id.* at 18-19.)

### b.  Defendant C.D. Perry's Opposition Memorandum of Law

Generally, in opposition to Defendant Atlas's motion for summary judgment, Defendant

C.D. Perry sets forth five arguments. (Dkt. No. 72.)

First, Defendant C.D. Perry argues that Defendant Atlas has not established that it is

entitled to contractual indemnification.[10] (*Id.* at 3.) More specifically, Defendant C.D. Perry

argues that the contract does not require it to immediately assume defending Defendant Atlas

unless and until the factfinder finds that Defendant C.D. Perry or an entity for which it is

responsible committed a negligent act or omission causing Plaintiff's injury. (*Id.* at 3-4.)

Defendant C.D. Perry argues that the "caused by" and "caused in whole or part by" language in

the relevant contractual provision requires a finding of proximate causation for the

_____

[10]     In its opposition, Defendant C.D. Perry highlights that Defendant Atlas's motion is
unclear as to whether Defendant Atlas seeks summary judgment solely on its contractual
indemnification crossclaim, or on all of its crossclaims against Defendant C.D. Perry. (Dkt. No.
72, at 2.) Defendant C.D. Perry therefore addresses each of Defendant Atlas's crossclaims (i.e.,
contractual indemnification, common-law indemnification, and contribution) in its opposition.
(*Id.*)

indemnification provision to be triggered. (*Id.*)

Second, Defendant C.D. Perry argues that the indemnification provision in its contract with Defendant Atlas is not triggered because there is no proximate causal nexus between Defendant C.D. Perry's work and Plaintiff's accident. (*Id.* at 6.) More specifically, Defendant C.D. Perry argues that it did not cause Plaintiff's injuries, and that Defendant Finger Lakes controlled, directed, and supervised all of its own work. (*Id.*) Defendant C.D. Perry also argues that it neither created (nor had notice of) the alleged condition leading to Plaintiff's injury (i.e., the alleged communication failures between Defendant Finger Lakes' employees or any alleged deficiency with Defendant Finger Lakes' radio communications equipment). (*Id.*)

Third, Defendant C.D. Perry argues that the Court cannot adjudicate Defendant Atlas's pending motion for contractual indemnification until after it adjudicates Defendant C.D. Perry's pending motion for contractual indemnification from Defendant Finger Lakes. (*Id.* at 7.) More specifically, Defendant C.D. Perry argues that, to the extent the Court is inclined to grant Defendant Atlas's motion for summary judgment regarding contractual indemnification, this Court must likewise grant Defendant C.D. Perry the following three forms of relief from Defendant Finger Lakes: (1) full indemnification of Defendant C.D. Perry; (2) full indemnification to Defendant Atlas via complete pass-through of liability; and (3) full assumption of any potential contractual indemnification obligation which Defendant C.D. Perry may owe to Defendant Atlas. (*Id.* at 7-8.) Defendant C.D. Perry argues that, pursuant to paragraph 1.2 of their subcontract, Defendant Finger Lakes is obligated to indemnify Defendant Atlas directly due to the flow-down provision. (*Id.* at 8.)

Fourth, Defendant C.D. Perry argues that a party seeking contractual indemnification

must establish that it was free from any negligence, which Defendant Atlas currently cannot establish because Plaintiff's claims allege negligent acts and/or omissions by Defendant Atlas. (*Id.* at 9.)

Fifth, Defendant C.D. Perry argues that Defendant Atlas cannot establish its common-law indemnification and/or contribution claims against Defendant C.D. Perry as a matter of law. (*Id.*) More specifically, Defendant C.D. Perry argues that Defendant Atlas cannot establish its common law indemnification and/or contribution claims against it because it neither created (nor had notice) of the alleged condition which caused Plaintiff's injury and the incident did not occur as a result of any act or omission by Defendant C.D. Perry. (*Id.* at 9-10.)

### c. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant Atlas's motion for summary judgment, Plaintiff sets forth four arguments. (Dkt. No. 73-19.)

First, Plaintiff argues that Defendant Atlas is liable under Labor Law § 241(6) by violating 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3). (*Id.* at 8-10.) More specifically, Plaintiff argues that it is undisputed that the communications systems, including the radios, cables, speakers, and microphones, constitute safety equipment on the site for divers to safely perform their work. (*Id.* at 9.) Plaintiff argues that, on the day of his accident, he was not advised on Clayberger's location or that Clayberger was about to use the hydraulic drill near Plaintiff's location, and that, had the radios worked properly, Plaintiff would have known of Clayberger's location and plans and would have removed himself from the danger zone. (*Id.* at 10.)

Plaintiff additionally argues that questions of fact remain as to whether there was a failure of the radio communications equipment, whether the employer had notice thereof, and whether

the equipment should have immediately been repaired or replaced. (*Id.* at 10-11.) Plaintiff argues

that his dive expert, James Wright, concluded that the dive radios were defective, faulty, or

damaged at the time of Plaintiff's injury. (*Id.* at 11.) Plaintiff also argues that both he and

Compton testified that the radio communications equipment was defective and that they

complained about these deficiencies to F. Morganti and Clayberger. (*Id.*)

Plaintiff further argues that 12 N.Y.C.R.R. § 23-1.5(c)(3) sets forth a distinct standard of

conduct, rather than a general reiteration of common-law principles, that can serve as a basis for

liability under Labor Law § 241(6). (*Id.* at 11-14.) Plaintiff argues that both he and Compton

advised Clayberger and F. Morganti of the various malfunctions of the radio communications

equipment, but the dive radios nonetheless remained in place, in violation of the relevant

Industrial Code regulation. (*Id.* at 14.)

Second, Plaintiff argues that Labor Law § 241(6) is a vicarious liability statute, meaning

liability is imposed on owners and contractors even where they do not direct or control the

activity. (*Id.* at 14-17.) More specifically, Plaintiff argues that the purpose of Labor Law §

241(6) is to impose a nondelegable duty upon owners and general contractors to provide

reasonable and adequate protection and safety to persons employed in construction, excavation,

or demolition work, regardless of the absence of supervision or direction of the work. (*Id.* at 14-

16.) Plaintiff also argues, that where the owner or general contractor (i.e., Defendant Atlas)

delegates to a third party the duty to conform to the Labor Law's requirements, that third party

becomes its statutory agent. (*Id.* at 16-17.)

Third, Plaintiff argues that questions of fact remain regarding whether the violation of 12

N.Y.C.R.R. §§ 23-1.5(c)(1) and (3) was the proximate cause of his injuries. (*Id.* at 17- 19.) More

specifically, Plaintiff argues that ample record evidence exists supporting the conclusion that the radios frequently dropped communications between divers and those in the radio shack, including on the day of Plaintiff's accident. (*Id.* at 17-18.) Plaintiff argues that the testimony shows that he asked about Clayberger's location during their dive, but that he was often unable to understand Hoffman's communications due to the alleged defects with the equipment. (*Id.* at 18-19.) Plaintiff argues that a jury could find that his communications were not received or heard as a result of the ongoing equipment failures. (*Id.* at 19.)

Fourth, Plaintiff argues that Defendant Atlas can be found liable for violation of Labor Law § 200 for its failure to discover the condition of the malfunctioning equipment. (*Id.* at 19-22.) More specifically, Plaintiff argues that Defendant Atlas had constructive knowledge of the allegedly defective radio communications equipment because, through its contract with the NYS Thruway Authority, it should have inspected the dive equipment but chose not to, and therefore did not properly uphold its duty of care. (*Id.* at 20-22.)

### d.  Defendant Finger Lakes' Opposition Memorandum of Law

Generally, in opposition to Defendant Atlas's motion for summary judgment, Defendant Finger Lakes sets forth three arguments. (Dkt. No. 75.)[11]

First, Defendant Finger Lakes argues that Defendant Atlas failed to mention a claim for indemnification against it in either its motion for summary judgment or corresponding Rule 56.1 Statement, and therefore it is procedurally improper for Defendant Atlas to assert this claim

---

[11]    Defendant Finger Lakes combined its oppositions to Defendant Atlas's motion and Defendant C.D. Perry's motion. (Dkt. No. 75.) In this section, the Court addresses only the arguments Defendant Finger Lakes made in response to Defendant Atlas's motion. (*Id.*)

against Defendant Finger Lakes. (*Id.* at 7-8.)

Second, Defendant Finger Lakes argues that, even if the Court finds that Defendant Atlas established a claim for indemnification against Defendant Finger Lakes, the Court should disregard any argument regarding "pass-through" indemnification because it was first raised in Defendant C.D. Perry's opposition to Defendant Atlas's motion for summary judgment, and therefore is procedurally improper. (*Id.* at 6-7.)

Third, Defendant Finger Lakes argues that any claim of "pass-through" indemnification fails as a matter of law because, "[u]nder New York law, incorporation clauses in a construction subcontract, incorporating prime contract clauses by reference into a subcontract, bind a subcontractor only as to prime contract provisions relating to the scope, quality, character, and manner of the work to be performed by the subcontractor . . . ." (*Id.* at 7 [quoting *Persaud v. Bovis Lend Lease, Inc.*, 93 A.D.3d 831, 833 (N.Y. App. Div. 2d Dep't 2012)].)

### e.   Defendant Atlas's Reply Memorandum of Law

Generally, in reply to the parties' oppositions, Defendant Atlas sets forth three arguments. (Dkt. No. 77-7.)

First, Defendant Atlas argues that the Court cannot find it liable for Plaintiff's Labor Law § 200 claim. (*Id.* at 5-9.) More specifically, Defendant Atlas argues that, even if the radio communications equipment was defective, Defendant Finger Lakes decided to continue using that equipment, meaning Plaintiff's injury was caused by Defendant Finger Lakes' manner of performing its work.[12] (*Id.*) Defendant Atlas argues that it can be liable pursuant to Labor Law §

---

[12]     Defendant Atlas argues that Plaintiff's opposition tacitly acknowledges that the accident arose from Defendant Finger Lakes' "means and methods" of performing its work because it asserted that Defendant Finger Lakes "launched an instrument of harm by forcing the divers to

200 only if it had the authority to control the activity bringing about the injury, which it argues it undisputedly did not. (*Id.* at 6-7.) Defendant Atlas argues that, pursuant to its contract with the NYS Thruway Authority, it only had the authority to enforce general safety standards, which is insufficient to establish the requisite supervisory control under Labor Law § 200. (*Id.*)

Second, Defendant Atlas argues that the Court should dismiss Plaintiff's Labor Law § 241(6) claim. (*Id.* at 9-14.) More specifically, Defendant Atlas argues that the language in 12 N.Y.C.R.R. § 23-1.5(c)(1) is too general to support a Labor Law § 241(6) claim. (*Id.* at 9-10.) Defendant Atlas further argues that Plaintiff cannot establish his Labor Law § 241(6) claim based on 12 N.Y.C.R.R. § 23-1.5(c)(3) for the following three reasons: (1) Plaintiff failed to rebut Defendant Atlas's showing that the alleged deficiency in the equipment was not the proximate cause of the accident (*id.* at 10-12); (2) any failures in communication regarding Plaintiff's and Clayberger's location while Clayberger operated the drill do not constitute violation of this Industrial Code regulation (*id.* at 13); and (3) Plaintiff failed to rebut Defendant Atlas's showing that it did not have notice of any alleged defect or unsafe condition (*id.* at 14).

Third, Defendant Atlas argues that the Court should grant summary judgment in its favor against Defendant C.D. Perry and issue a conditional order for contractual indemnification. (*Id.* at 15-16.) Defendant Atlas argues that, even if there has been no finding of liability against Defendant C.D. Perry, the Court can order conditional indemnification pending determination of the primary action. (*Id.* at 15.) Defendant Atlas argues that, because its alleged liability is purely statutory under New York State Labor Laws, it is entitled to a conditional order of defense and

---

use the inferior, damaged defective dive radios." (Dkt. No. 80, at 7 [quoting Dkt. No. 73-19, at 17].)

indemnification. (*Id.*) Defendant Atlas further argues that, if the Court grants Defendant C.D. Perry full indemnification from Defendant Finger Lakes, the Court should also find that Defendant Finger Lakes owes full indemnification to Defendant Atlas by means of complete pass-through of liability, and that Defendant Finger Lakes fully assumes any potential contractual indemnification obligation which the Court may find that Defendant C.D. Perry owes Defendant Atlas. (*Id.* at 15-16.)

### 2.   Defendant C.D. Perry's Motion for Summary Judgment

#### a.   Defendant C.D. Perry's Memorandum of Law

Generally, in support of its motion for summary judgment, Defendant C.D. Perry sets forth six arguments. (Dkt. No. 79.)

First, Defendant C.D. Perry argues that Plaintiff's Labor Law claims are preempted by federal maritime law. (*Id.* at 13-14.) More specifically, Defendant C.D. Perry argues that the federal Longshore and Harbor Workers' Compensation Act ("LHWCA") preempts Plaintiff's Labor Law § 241(6) claim. (*Id.*) Defendant C.D. Perry argues that, because Plaintiff alleges that he qualifies as a Jones Act Seaman and is entitled to damages under the LHWCA, he cannot maintain a claim for damages under Labor Law § 241(6). (*Id.* at 14.)

Second, Defendant C.D. Perry argues that Plaintiff's Labor Law claims are otherwise inapplicable and should be dismissed. (*Id.* at 14-17.) More specifically, Defendant C.D. Perry argues that, for Plaintiff to recover under Labor Law § 200, he must show that Defendant C.D. Perry exercised actual supervisory control over the operation and/or Plaintiff's work, which Plaintiff cannot do because Defendant Finger Lakes' directed and controlled the means and methods for performing the underwater construction. (*Id.* at 14-15.) Defendant C.D. Perry argues

that the only communication between F. Morganti and Defendant C.D. Perry concerned general mobilization of Defendant Finger Lakes' work force and equipment, coordination, and scheduling. (*Id.* at 15-16.) Defendant C.D. Perry further argues that Plaintiff cannot maintain his Labor Law § 241(6) claim because he failed to set forth any specific Industrial Code provisions that Defendant C.D. Perry allegedly violated. (*Id.* at 16-17.)

Third, Defendant C.D. Perry argues that it is entitled to full contractual indemnification from Defendant Finger Lakes, including costs of defense. (*Id.* at 17-19.) More specifically, Defendant C.D. Perry argues that Plaintiff's injury was caused either by his own negligence or Defendant Finger Lakes' negligence when supervising the project, meaning Defendant Finger Lakes must indemnify it. (*Id.* at 18-19.) Defendant further argues that, despite immediately tendering its defense and demanding insurance coverage from Defendant Finger Lakes in accordance with their subcontract, Defendant Finger Lakes failed to procure the necessary insurance and Defendant C.D. Perry is entitled to damages. (*Id.* at 19-20.)

Fourth, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's Jones Act claim. (*Id.* at 20-23.) More specifically, Defendant C.D. Perry argues that the following nine factors used to determine whether an employee is a "borrowed servant" are not met in this case: (1) Defendant C.D. Perry did not supervise, inspect, direct, or control Plaintiff or the means and methods Defendant Finger Lakes' crewmembers used to complete the underwater timber restoration; (2) Plaintiff performed his work for Defendant Finger Lakes, not Defendant C.D. Perry; (3) no agreement exists between Plaintiff and Defendant C.D. Perry, and the contract between Defendant C.D. Perry and Defendant Finger Lakes required Defendant Finger Lakes to perform all of the underwater timber restoration work without Defendant C.D. Perry's

40

continuous direction or general supervision; (4) Plaintiff continuously worked for Defendant

Finger Lakes; (5) Defendant Finger Lakes did not terminate the employment relationship until

after Plaintiff's accident; (6) Defendant Finger Lakes furnished and tested the tools and

equipment provided to Plaintiff; (7) Plaintiff's employment was short in duration; (8) Defendant

C.D. Perry could not terminate Plaintiff's employment; and (9) Defendant C.D. Perry did not pay

Plaintiff's wages. (*Id.* at 21-23.)

      Fifth, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's claim for

unseaworthiness. (*Id.* at 23-24.) More specifically, Defendant C.D. Perry argues that there is no

evidence to support a finding that its barge was not reasonably fit for its intended use, or that an

alleged unseaworthy condition of the barge contributed to Plaintiff's accident. (*Id.* at 23.)

Defendant C.D. Perry argues that Plaintiff's expert failed to mention any unseaworthy factors

about the barge, and instead focused his report on failures to communicate between Hoffman and

Clayberger. (*Id.*) Defendant C.D. Perry argues that Plaintiff further failed to show any causal

relationship between his accident and any unseaworthy condition of the barge. (*Id.* at 24.)

      Sixth, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's vessel

negligence claim. (*Id.* at 24-28.) More specifically, Defendant C.D. Perry argues that its

"turnover duty" is not implicated because Plaintiff has not established that any alleged dangerous

condition of the vessel caused or contributed to his accident. (*Id.* at 25-26 [quoting *Scindia Steam*

*Navigation Co. v. De Los Santos*, 451 U.S. 156, 165 (1981)].) Defendant C.D. Perry also argues

that it did not breach its "active control" duty because it did not have any control of Defendant

Finger Lakes' operations. (*Id.* at 26-27 [quoting *Scindia*, 451 U.S. at 165.]) Defendant further

argues that it did not breach its "duty to intervene" because there is no evidence that the vessel,

41

equipment, or a condition thereof posed an unreasonable risk of harm, or that Defendant C.D.

Perry had actual knowledge of any alleged dangerous condition. (*Id.* at 27-28.)

### b. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant C.D. Perry's motion for summary judgment,

Plaintiff sets forth four arguments. (Dkt. No. 74-19.)

First, Plaintiff argues that his Labor Law claims are not preempted if the Court finds

Plaintiff is a "seaman." (*Id.* at 10-13.) More specifically, Plaintiff concedes that his only Jones

Act claim is against Defendant Finger Lakes, and that he no longer asserts that he was a

borrowed servant of Defendant C.D. Perry. (*Id.* at 10.) Plaintiff argues that, regardless of whether

Plaintiff was a "seaman" or a "Harbor Worker," Defendant C.D. Perry can be liable as a third-

party for Plaintiff's injuries.[13] (*Id.* at 11.) Plaintiff argues that, if he is a "seaman" (as he

contends), then Section 905(b) of the LHWCA does not apply to him and cannot preempt his

state law claims. (*Id.* at 11-12.) Plaintiff additionally argues that there is no prohibition against a

seaman bringing third-party claims asserting state law remedies and liability theories. (*Id.* at 12.)

Plaintiff argues that, if the Court determines Plaintiff is a seaman but that he does not have an

unseaworthiness remedy against Defendant C.D. Perry as a matter of law, Plaintiff is nonetheless

entitled to bring his state law claims against Defendant C.D. Perry as a contractor. (*Id.* at 12-13.)

Plaintiff further argues that, if he is a seaman, he is entitled to assert an unseaworthiness

claim against Defendant C.D. Perry for the allegedly "shoddy" equipment Defendant Finger

---

[13]    Plaintiff argues that he is a "seaman" under the Jones Act, and not a covered employee
under the LHWCA, but states that his status as a "seaman" is a question for the jury. (Dkt. No.
74-19, at 11.) Plaintiff further recognizes that, should he be found to not be a "seaman," his
remedy would be limited to receipt of benefits under the LHWCA from his employer. (*Id.*)

Lakes provided as an appurtenance to the vessel. (*Id.* at 13.) Plaintiff argues that an unseaworthiness claim enforces the shipowner's absolute duty to provide every member of the crew with a vessel and appurtenances reasonably fit for their intended use, which Plaintiff argues Defendant C.D. Perry did not provide due to the allegedly defective radio communications equipment located in Defendant Finger Lakes' dive shack on Defendant C.D. Perry's barge. (*Id.* at 13-14.)

Second, Plaintiff argues that, if he is not a seaman, he is covered by the LHWCA, which also does not preempt his Labor Law §§ 200 and 241(6) claims. (*Id.* at 14-16.) More specifically, Plaintiff argues that he may pursue his Labor Law claims against Defendant C.D. Perry in its capacity as a construction contractor, rather than as a vessel owner. (*Id.* at 14-15.) Plaintiff additionally argues that the LHWCA does not preempt causes of action alleging common-law negligence and violation of Labor Law § 200. (*Id.* at 16.)

Third, Plaintiff argues that Defendant C.D. Perry can be held liable under Labor Law § 241(6) for violations of 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3). (*Id.* at 17-28.) More specifically, Plaintiff restates its arguments from its opposition to Defendant Atlas's motion for summary judgment on the following four topics: (1) the remaining questions of fact with respect to the defective radio communications equipment; (2) liability under New York Labor Law § 241(6) pursuant to violations of 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3); (3) Defendant C.D. Perry's vicarious liability as a subcontractor under Labor Law § 241(6); and (4) the remaining questions of fact regarding whether the violation of the Industrial Code regulations was the proximate cause of Plaintiff's injuries. (*Id.*)[14]

---

[14]     Plaintiff's argument appears to have been copied and pasted from its opposition to

Fourth, Plaintiff argues that the factfinder could find Defendant C.D. Perry liable under Labor Law § 200 for its failure to discover the dangerous condition (i.e., the malfunctioning radio communications equipment). (*Id.* at 28-30.) More specifically, Plaintiff restates its arguments from its opposition to Defendant Atlas's motion for summary judgment regarding Defendant C.D. Perry's duty to inspect Defendant Finger Lakes' equipment.[15] (*Id.*)

### c.   Defendant Finger Lakes' Opposition Memorandum of Law

Generally, in opposition to Defendant C.D. Perry's motion for summary judgment, Defendant Finger Lakes sets forth three arguments. (Dkt. No. 75.)

First, Defendant Finger Lakes argues that its subcontract with Defendant C.D. Perry requires a finding of causation before the indemnification obligations are triggered, and that no finding of causation has occurred in this case. (*Id.* at 4-5.) Defendant Finger Lakes argues that, unless and until there is a legal determination that Plaintiff's injury was caused by the negligent acts or omissions of Defendant Finger Lakes or its specified agents, any indemnification claim is premature. (*Id.* at 4.) Defendant Finger Lakes further argues that, for Defendant C.D. Perry to establish a right to contractual indemnification or common law indemnification, it must also prove that it was free from any active negligence relating to the underlying accident. (*Id.* at 5-6.) Defendant Finger Lakes further argues that any claim for attorneys' fees is premature because there have been no findings on the parties' degrees (if any) of comparative negligence. (*Id.* at 6.)

Defendant Atlas's motion for summary judgment, because Plaintiff refers to Defendant Atlas on multiple occasions when he seemingly intends to refer to Defendant C.D. Perry. (Dkt. No. 74-19, at 17-28.)

15     Plaintiff again interchanges Defendant Atlas for Defendant C.D. Perry in this section of his opposition. (*Id.* at 30.)

Second, Defendant Finger Lakes argues that, with respect to the claim regarding insurance coverage, it is not privy to the response Defendant C.D. Perry received from its insurance providers and is unable to discern on what basis Defendant C.D. Perry speculates that Defendant Finger Lakes failed to procure insurance. (*Id.*)

Third, Defendant Finger Lakes argues that any claim of "pass-through" indemnification fails as a matter of law because, "[u]nder New York law, incorporation clauses in a construction subcontract, incorporating prime contract clauses by reference into a subcontract, bind a subcontractor only as to prime contract provisions relating to the scope, quality, character, and manner of the work to be performed by the subcontractor . . . ." (*Id.* at 7 [quoting *Persaud*, 93 A.D.3d at 833].)

### d.   Defendant C.D. Perry's Reply Memoranda of Law

#### i.   Defendant C.D. Perry's Reply to Plaintiff's Opposition

Generally, in reply to Plaintiff's opposition, Defendant C.D. Perry sets forth nine arguments. (Dkt. No. 78.)

First, Defendant C.D. Perry argues that Plaintiff's Labor Law § 241(6) claim is preempted. (*Id.* at 2-3.) More specifically, Defendant C.D. Perry argues that *Lee v. Astoria Generating Co., L.P.*, 13 N.Y.3d 382 (N.Y. 2008), requires the Court to preclude, at minimum, Plaintiff's Labor Law § 241(6) claim. (*Id.*) Defendant C.D. Perry argues that summary judgment is warranted because Plaintiff failed to raise a triable issue of fact as to whether Defendant C.D. Perry was a vessel owner and operator entitled to preemption under the LHWCA. (*Id.* at 3.)

Second, Defendant C.D. Perry argues that Plaintiff's Labor Law § 200 claim is unsupported by the evidence. (*Id.* at 3-4.) More specifically, Defendant C.D. Perry argues that,

even if it was contractually obligated to provide for the safety of the employees performing the work it subcontracted, Defendant C.D. Perry did not direct or control Defendant Finger Lakes' "means and methods," nor did it have knowledge of a potential issue involving Defendant Finger Lakes' communication with its employees or the way it operated its communication equipment. (*Id.* at 4.) Defendant C.D. Perry argues that it therefore cannot be liable under Labor Law § 200. (*Id.*)

Third, Defendant C.D. Perry argues that the Court must not apply *Eldoh v. Astoria Generating Company*, 81 A.D.3d 871 (N.Y. App. Div. 2d Dep't)—a case Plaintiff cites in its opposition—to this case because the facts are notably different. (*Id.* at 4-5.) More specifically, Defendant C.D. Perry argues that, if Plaintiff's claims of negligence arise from his allegations that he received insufficient instruction from his dive tenders or insufficient communication equipment from his employer, Plaintiff cannot claim that his injuries arose out of Defendant C.D. Perry's alleged negligence. (*Id.* at 5.)

Fourth, Defendant C.D. Perry argues that the standard terms of its subcontract with Defendant Atlas regarding renovation of the fender system do not establish that Defendant C.D. Perry is a statutory agent of Defendant Atlas. (*Id.* at 5-7.) More specifically, Defendant C.D. Perry argues that there is no evidence that it assumed Defendant Atlas's responsibility for the general safety of the construction site as contemplated by Labor Law § 241(6), and that Defendant C.D. Perry's contractual obligations were clearly and unambiguously limited to a specific scope of work that did not create an agency relationship. (*Id.* at 5-6.) Defendant C.D. Perry further argues that Plaintiff failed to raise a triable issue of fact that it supervised, directed, or controlled Defendant Finger Lakes' means and methods of performing its work. (*Id.* at 6.)

46

Defendant C.D. Perry argues that liability under Labor Law §§ 200 and 241(6) does not extend to subcontractors by virtue of contract language that requires a subcontractor to generally watch over its sub-subcontractors. (*Id.* at 7.)

Fifth, Defendant C.D. Perry argues that Plaintiff has not demonstrated a meritorious cause of action in tort based on Defendant C.D. Perry's alleged breach of its contract with Defendant Atlas. (*Id.* at 7-8.) More specifically, Defendant C.D. Perry argues that Plaintiff did not establish that it launched a force or instrument of harm, that Plaintiff detrimentally relied on it regarding the continued performance of its duties under its contract with Defendant Atlas, or that it entirely displaced Defendant Atlas as the general contractor. (*Id.*)

Sixth, Defendant C.D. Perry argues that Plaintiff's Labor Law § 241(6) claims are subject to dismissal because Plaintiff cannot demonstrate that a violation of an applicable Industrial Code regulation was the proximate cause of Plaintiff's injury. (*Id.* at 8-9.) More specifically, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's Labor Law § 241(6) claim for the following three reasons: (1) Plaintiff's injuries did not arise from an oversized drill bit, but rather from the alleged failure of Plaintiff's coworkers to provide him with proper communication, which does not trigger 12 N.Y.C.R.R. § 23-1.5(c)(3); (2) dive radios do not constitute a failed "safety device" as contemplated by New York's Labor Law or the Industrial Code, and courts have held that coworkers are not safety devices; and (3) 12 N.Y.C.R.R. § 23-1.5(c)(1) cannot serve as a predicate to Labor Law § 241(6) claims because of its non-specific language. (*Id.*)

Seventh, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's Jones Act claim against it. (*Id.* at 9.) More specifically, Defendant C.D. Perry argues that Plaintiff conceded

in his opposition that he is not a borrowed servant of Defendant C.D. Perry and that he asserts this claim solely against Defendant Finger Lakes. (*Id.*)

Eighth, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's unseaworthiness claim. (*Id.* at 9-10.) More specifically, Defendant C.D. Perry argues that Plaintiff fails to allege any insufficient methods or equipment by Defendant C.D. Perry, and instead cites allegedly unseaworthy conditions by Defendant Finger Lakes. (*Id.*) Defendant C.D. Perry argues that Plaintiff fails to produce any objective evidence establishing that his accident can be attributed to an allegedly unseaworthy condition of the barge, and therefore cannot prove the requisite causal relationship for his unseaworthiness claim. (*Id.* at 10.)

Ninth, Defendant C.D. Perry argues that the Court should dismiss Plaintiff's vessel negligence claim. (*Id.* at 10-11.) More specifically, Defendant C.D. Perry argues that there was no vessel negligence because it did not violate the "turnover duty," "active control duty," or "duty to intervene." (*Id.* at 11.)

### ii.   Defendant C.D. Perry's Reply to Defendant Finger Lakes' Opposition

Generally, in reply to Defendant Finger Lakes' opposition, Defendant C.D. Perry sets forth four arguments. (Dkt. No. 79.)

First, Defendant C.D. Perry argues that it is entitled to contractual indemnification from Defendant Finger Lakes, including costs of defense. (*Id.* at 2-5.) More specifically, Defendant C.D. Perry argues that Defendant Finger Lakes fails to provide evidence establishing that it did not cause the accident, or that Defendant C.D. Perry was actively negligent with respect to the accident. (*Id.* at 2.) Defendant C.D. Perry argues that there is no evidence to allow the fact finder to conclude that Plaintiff's injury was caused by anything other than Plaintiff's own negligence,

48

Defendant Finger Lakes' negligence, or a combination of the two, meaning Defendant C.D. Perry is entitled to full indemnification from Defendant Finger Lakes. (*Id.* at 3-5.)

Second, Defendant C.D. Perry argues that it is entitled to conditional indemnification from Defendant Finger Lakes. (*Id.* at 5-6.) More specifically, Defendant C.D. Perry argues that, even if the Court finds the indemnification issue is premature, the Court can still issue a conditional order with respect to indemnification. (*Id.* at 5.) Defendant C.D. Perry argues that it had no active negligence with respect to Plaintiff's accident and is therefore entitled to a conditional order as to contractual indemnification from Defendant Finger Lakes. (*Id.* at 6.)

Third, Defendant C.D. Perry argues that it is entitled under the contract to "pass-through" indemnification from Defendant Finger Lakes for Defendant Atlas. (*Id.* at 6-9.) More specifically, Defendant C.D. Perry argues that it did not first raise the pass-through indemnification argument at the summary judgment stage, but rather provided Defendant Finger Lakes with multiple tender letters starting on July 3, 2019. (*Id.* at 6-7.) Defendant C.D. Perry additionally argues that Fed. R. Civ. P. 56(f) permits the Court to grant the motion on grounds not raised by a party, and Defendant C.D. Perry requests that the Court grant pass-through indemnification based on the flow-down provision in Defendant Finger Lakes' subcontract. (*Id.* at 7.) Defendant C.D. Perry argues that any indemnification responsibility that it may have to Defendant Atlas would be a loss or expense that falls within Defendant Finger Lakes' obligation to indemnify Defendant C.D. Perry, pursuant to paragraph 3.7.1 of the contract, and to indemnify Defendant Atlas directly, pursuant to the flow-down provision in paragraph 1.2. (*Id.* at 8-9.)

Fourth, Defendant C.D. Perry argues that Defendant Finger Lakes' failure to procure insurance adding Defendant C.D. Perry as an additional insured constitutes a breach of their

49

contract. (*Id.* at 9-11.) More specifically, Defendant C.D. Perry argues that Defendant Finger

Lakes' counsel received a tender letter from Defendant C.D. Perry's counsel demanding that it

defend Defendant C.D. Perry as an additional insured, so Defendant Finger Lakes cannot argue it

was not privy to correspondence about its duty to defend. (*Id.* at 9.) Defendant C.D. Perry argues

that Defendant Finger Lakes breached their contract by failing to procure insurance adding

Defendant C.D. Perry as an additional named insured, and it is therefore entitled to damages. (*Id.*

at 11.)

## II.      LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).[16]

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In

addition, "[the movant] bears the initial responsibility of informing the district court of the basis

for its motion and identifying those portions of the . . . [record] which it believes demonstrate the

absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

---

[16]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted). As the Supreme Court has explained, "[the non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[17] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1(b). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[18]

Similarly, in this District, where a non-movant has willfully failed to respond to a

---

[17]   *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J) (citing cases).

[18]   Among other things, Local Rule 56.1(b)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 56.1(b).

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

Rule 56.1(b)(3).[19]

## III.   ANALYSIS

### A.   Whether the Court Should Grant Defendant Atlas's Motion for Summary Judgment

After carefully considering the matter, the Court answers the question in the affirmative

with respect to Plaintiff's Labor Law § 200 claim for the reasons stated in Defendant Atlas's

memorandum of law (Dkt. No. 66-18), and in the negative with respect to Plaintiff's Labor Law

§ 241(6) claim and Defendant Atlas's contractual indemnification claim again Defendant C.D.

Perry for the reasons set forth in Plaintiff's and Defendant C.D. Perry's memoranda of law (Dkt.

No. 72, 73-19). To those reasons, the Court adds the following analysis, which is intended to

supplement, and not to supplant, the parties' reasoning.

#### 1.   Plaintiff's Claims Against Defendant Atlas

##### a.   New York Labor Law § 200

New York Labor Law § 200 "is a codification of the common-law duty of a landowner to

provide workers with a reasonably safe place to work." *Lombardi v. Stout*, 80 N.Y.2d 290, 294-

---

[19]      *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8 (N.D.N.Y. Mar. 17, 1999)
(McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments
by defendants in their motion for summary judgment as consent by plaintiff to the granting of
summary judgment for defendants with regard to the claims that the arguments regarded, under
N.D.N.Y. L.R. 56.1(b)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343,
at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to an
"aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the
court should exclude [the expert's] testimony" on that ground).

95 (N.Y. 1992); *Roberts v. Globalfoundries, U.S., Inc.*, 13-CV-1169, 2015 WL 12942046, at *10

(N.D.N.Y. 1993) (McAvoy, J.) ("Common-law negligence claims are analyzed under the same

standards as Labor Law § 200 claims . . . ."). Pursuant to Labor Law § 200, "[w]hen an 'alleged

defect or dangerous condition arises from [a] contractor's methods and the owner exercises no

supervisory control over the operation, no liability attaches to the owner under the common law

or under Labor Law § 200.'" *Cook v. Orchard Park Estates, Inc.*, 73 A.D.3d 1263, 1265 (N.Y.

App. Div. 3d Dep't 2010) (quoting *Comes v. New York State Elec. & Gas Corp.*, 82 N.Y.2d 876,

877 (N.Y. 1993)); *Lombardi*, 80 N.Y.2d at 294-95. "[A]n owner or general contractor's retention

of general supervisory control, presence at the worksite or authority to enforce general safety

standards is insufficient to establish the necessary control [for a Labor Law § 200 claim]."

*Sainato v. City of Albany*, 285 A.D.2d 708, 709 (N.Y. App. Div. 3d Dep't 2001) (internal

quotation marks omitted). More specifically, where "'[t]here is no evidence that [an owner or

contractor] gave anything more than general instructions on what needed to be done,'" and

instead provided only "'monitoring and oversight of the timing and quality of the work,'" a court

should not impose liability under Labor Law § 200 or under the common law. *Mitchell v. NRG

Energy, Inc.*, 125 A.D.3d 1542, 1543-44 (N.Y. App. Div. 4th Dep't 2015) (quoting *Dalanna v.

City of N.Y.*, 308 A.D.2d 400, 400 (N.Y. 2003)).

Alternatively, "[w]here a plaintiff's injuries stem from a *dangerous condition on the

premises*, a defendant may be liable if it had control over the work site and either created the

dangerous condition or had actual or constructive notice of it." *Dwyer v. Goldman Sachs

Headquarters, LLC*, 819 F. Supp. 2d 320, 329 (S.D.N.Y. 2011) (emphasis added and internal

quotation marks omitted); *Cook v. Orchard Park Estates, Inc.*, 73 A.D.3d 1263, 1265 (N.Y. App.

Div. 3d Dep't 2010) (quoting *Wolfe v. LKR Mech., Inc.*, 35 A.D.3d 916, 918 (N.Y. App. Div. 3d Dep't 2006)).[20]

Based on the undisputed facts, the Court finds that Defendant Atlas did not retain or exercise the requisite supervisory control to be liable for Plaintiff's injury if "the alleged defect or dangerous condition ar[ose] from [Defendant Finger Lakes'] methods . . ." *Lombardi*, 80 N.Y.2d at 294-95. In fact, Plaintiff explicitly admitted that "[Defendant] Atlas did not control the means, the manner, or the method of Defendant Finger Lakes' work," nor did it "give anyone at [Defendant] Finger Lakes any directions, instructions, or other guidance concerning its performance on the project." (Dkt. No. 73-20, at 35-36.)  Plaintiff also admits that F. Morganti testified that he was unaware of any of Defendant Finger Lakes' employees, including himself, communicating with anyone from Defendant Atlas. (*Id.* at 34.) Based on these facts and Plaintiff's lack of argument on the issue of control in his opposition, Plaintiff effectively concedes the point regarding Defendant Atlas not exercising supervisory control. (Dkt. No. 73-19, at 19-22.)

Plaintiff instead argues that, "although Atlas and C.D. Perry likely did not have actual knowledge of the defective condition of the dive radios, they had constructive knowledge in that

---

[20]     *See also Baklous v. Amtrak*, 933 F. Supp. 2d 444, 454 (E.D.N.Y. 2013) ("Where a *premises condition* is at issue, property owners may be held liable for violation of Labor Law § 200 if the owner either created the dangerous condition that caused the accident or had actual or constructive notice of the dangerous condition that caused the accident.") (quoting *Ortega v. Puccia*, 57 A.D.3d 54 (N.Y. App. Div. 2d Dep't 2008) (emphasis added)); *Mendoza v. Highpoint Assoc., IX, LLC*, 83 A.D.3d 1, 9 (N.Y. App. Div. 1st Dep't 2011) ("Where, as here, the accident arises not from the methods or manner of the work, *but from a dangerous premises condition*, 'a property owner is liable under Labor Law § 200 when the owner created the dangerous condition causing an injury or . . . failed to remedy a dangerous or defective condition which he or she had actual or constructive notice.") (emphasis added).

they *should have known* through reasonable inspection of the equipment used by Finger Lakes . . . .." (Dkt. No. 73-19, at 19 [emphasis in original].)[21] Based on this argument, Plaintiff relies on the theory of premises liability described above to hold Defendant Atlas liable under Labor Law § 200.

Allegedly defective radio communications equipment is not an "unsafe or dangerous" *premises* condition, however, but instead is a tool or method Defendant Finger Lakes used to perform its underwater construction work. "There is a distinction between those cases in which the injury was caused by the defective condition of the premises and those in which the injury was the result of a defect not in the land itself, but in the equipment or its operation." *Miller v. Wilmorite*, 231 A.D.2d 843, 843 (N.Y. App. Div. 4th Dep't 1996) (internal quotation marks omitted). With respect to the latter, as the Court previously addressed, "[t]here is no liability under § 200 'when the injury arises out of a defect in the subcontractor's own plant, *tools and methods*, or through negligent acts of the subcontractor occurring as a detail of the work'" where there is no supervisory control by the owner or general contractor. *Forshaw v. U.S.*, 96-CV-0150, 1998 WL 641357, at *4 (N.D.N.Y. Sept. 14, 1998) (McAvoy, C.J.) (emphasis added); *Kaczmarek v. Bethlehem Steel Corp.*, 884 F. Supp. 768, 774 (W.D.N.Y. 1995); *Miller*, 231 A.D.2d at 843. Thus, under Labor Law § 200, "an owner or general contractor will not be held liable for a subcontractor's failure to furnish safe equipment . . . ." *Edwards v. State Univ.*

---

[21]     *See Cook*, 73 A.D.3d at 1265 ("[W]hen 'a worker's injuries result from an unsafe or dangerous condition existing at a work site, rather than from the manner in which the work is being performed, the liability of a general contractor . . . depends upon whether they had notice of the dangerous condition and control of the place where the injury occurred.'") (quoting *Wolfe*, 35 A.D.3d at 918).

*Constr. Fund*, 196 A.D.3d 778, 782 (N.Y. App. Div. 3d Dep't 2021); *Lombardi*, 178 A.D.2d at

595 (stating that the owner or general contractor is not "required to protect the employees from

defects in the [sub]contractor's tools and methods.").

The Second Department addressed the distinction between the theories of liability under

Labor Law § 200 in *Ortega v. Puccia*, 57 A.D.3d 54 (N.Y. App. Div. 2d Dep't 2008). In *Ortega*,

the plaintiff brought various claims against the defendants after he fell from a scaffold. *Ortega*,

57 A.D.3d at 56. After addressing the two categories of Labor Law § 200 claims (i.e., "those

where workers are injured as a result of dangerous or defective premises conditions at a

worksite" and "those involving the manner in which the work is performed"), the *Ortega* Court

addressed in detail the former category of Labor Law § 200 claims:

> In this case, the plaintiff's accident did not involve any dangerous
> or defective condition on the defendants' premises. The accident
> instead involved the manner in which the plaintiff performed his
> work, which was not supervised by the defendants, and which was
> performed on equipment provided by the plaintiff's employer, not
> by the defendants. As stated by the Court of Appeals, 'the duty to
> provide a safe place to work is not breached when the injury arises
> out of a defect in the subcontractor's own plant, tools and methods,
> or through negligent acts of the subcontractor occurring as a detail
> of the work[.]' *Persichilli v. Triborough Bridge & Tunnel Auth.*, 16
> N.Y.2d 136, 145, 262 N.Y.S.2d 476, 209 N.E.2d 802). In *Persichilli*,
> the Court of Appeals further stated that while a subcontractor must
> furnish safe ladders and scaffolds to its employees, *a
> subcontractor's failure to provide safe appliances does not render
> the 'premises' unsafe or defective. The allegedly defective scaffold
> should instead be viewed as a device involving the methods and
> means of the work.* Under such circumstances, Labor Law § 200
> imposes no liability . . . absent evidence of the . . . authority to
> supervise or control the manner and methods of the work.

*Id.* at 62-63.

Here, the allegedly defective radio communications equipment was a "tool" Defendant

Finger Lakes provided and used to perform its underwater construction work, and therefore does

not constitute a "dangerous or defective premises condition" for which Defendant Atlas is liable.

Plaintiff must recognize this point, because he states in his motion for summary judgment that,

"[w]here the injury was caused by the manner and means of the work, *including the equipment*

*used*," the party is liable only if it "actually exercised supervisory control over the injury-

producing work." (Dkt. No. 73-19, at 20 [emphasis added].) The Court therefore grants

Defendant Atlas's motion for summary judgment on Plaintiff's Labor Law § 200 claim.

### b.  New York Labor Law § 241(6)

New York Labor Law § 241(6) "requires owners and contractors to provide reasonable

and adequate protection and safety for workers and to comply with the specific safety rules and

regulations promulgated by the Commissioner of the Department of Labor." *Ross v. Curtis-*

*Palmer Hydro-Electric., Co.*, 81 N.Y.2d 494, 501 (N.Y. 1993) (internal quotation marks

omitted). The duty set forth in New York Labor Law § 241(6) is nondelegable, meaning liability

can be imposed "upon a general contractor for the negligence of a subcontractor, even in the

absence of control or supervision of the worksite.'" *Rizzuto v. L.A. Wenger Contr. Co.*, 91

N.Y.2d 343, 348-49 (N.Y. 1998) (quoting *Allen v. Cloutier Constr. Corp.*, 44 N.Y.2d 290, 300

(N.Y. 1978)) (emphasis removed). Here, Plaintiff argues that 12 N.Y.C.R.R. §§  23.15(c)(1) and

(3) were violated and that these violations serve as the bases for his Labor Law § 241(6) claim.

(Dkt. No. 73-19, at 8-19.)

Preliminarily, the Court dismisses Plaintiff's Labor Law § 241(6) claim to the extent it

relies on alleged violations of 12 N.Y.C.R.R. § 23.15(c)(1), because that particular subsection of

the regulation is not sufficiently specific to serve as a basis for his claim. "It is well established

that, in a Labor Law § 241(6) claim, the rule or regulation alleged to have been breached must be a 'specific, positive command.'" *Gasques v. State of N.Y.*, 15 N.Y.3d 869, 870 (N.Y. 2010) (quoting *Rizzuto*, 91 N.Y.2d at 349). Multiple courts have held that "12 N.Y.C.R.R. 23-1.5(c)(1) does not set forth a specific standard of conduct and therefore cannot serve as a predicate for a Labor Law § 241(6) claim"—an outcome with which the Court agrees. *Gasques*, 15 N.Y.3d at 870; *Jackson v. Hunter Roberts Constr. Grp., LLC*, 161 A.D.3d 666, 667-68 (N.Y. App. Div. 1st Dep't 2018); *Ortega v. Trinity Hudson Holding, LLC*, 176 A.D.3d 625, 626 (N.Y. App. Div. 1st Dep't 2019).

The regulation set forth in 12 N.Y.C.R.R. § 23-1.5(c)(3), on the other hand, "is sufficiently specific[,]" *Jackson*, 161 A.D.3d at 667-68, and therefore the Court must assess whether a genuine dispute of material fact remains regarding Defendant Atlas's alleged liability on Plaintiff's Labor Law § 241(6) claim. Pursuant to 12 N.Y.C.R.R. § 23-1.5(c)(3), "[a]ll safety devices, safeguards and equipment in use shall be kept sound and operable, and shall be immediately repaired or restored or immediately removed from the job site if damaged." 12 N.Y.C.R.R. § 23-1.5(c)(3). Defendant argues that the Court should grant summary judgment in its favor with respect to any alleged violations of 12 N.Y.C.R.R. § 23.15(c)(3) for the following three reasons: (1) Plaintiff fails to allege that the drill Clayberger used was defective, meaning neither Plaintiff nor Clayberger used defective equipment at the time of the accident; (2) to the extent the radio communications equipment was defective or inoperable, any alleged deficiency was not a proximate cause of the accident; and (3) even if the radios communications equipment was defective, Defendant Atlas did not have the requisite notice of the allegedly defective equipment (as required by 12 N.Y.C.R.R. § 23-1.5(c)(3)) for it to "immediately repair[] or

58

restore[] or immediately remove[] [it] from the job site . . . ." (Dkt. No. 66-18, at 12-15 [quoting 12 N.Y.C.R.R. § 23.15(c)(3)].)

Initially, the Court notes that Defendant's argument about the operability of the drill does not foreclose Plaintiff's Labor Law § 241(6) claim, because Plaintiff's arguments focus on the inoperability of the radio communications equipment and its alleged role in Plaintiff's accident. (Dkt. No. 73-19, at 8-19.) The Court recognizes that Plaintiff's expert's report identifies that a different augur for the drill should have been used when Clayberger was drilling, but the report also addresses the allegedly defective radio communications equipment and specifically cites 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3) in relation to it. (Dkt. No. 74-15, at 18-21.) Based on these allegations, it is inaccurate for Defendant Atlas to state that neither Plaintiff nor Clayberger were using defective equipment at the time of the accident, because a genuine dispute of material fact may remain regarding whether the radio communications equipment was defective.

The Court also finds that a genuine dispute of material fact indeed exists regarding whether the allegedly deficient radio communications equipment was the proximate cause of Plaintiff's injury. *See Pereira v. Hunt/Bovis Lend Lease Alliance II*, 193 A.D.3d 1085, 1085 (N.Y. App. Div. 2d Dep't 2021) ("[T]o establish liability under Labor Law § 241(6), a plaintiff must demonstrate that the defendant's violation of a specific rule or regulation was the proximate cause of the accident[.]") (internal citations omitted). Granted, there are five relevant undisputed facts regarding the communication between Hoffman, Clayberger, and Plaintiff leading up to his injury: (1) Plaintiff testified that, between getting the last bolt and the point of being injured, Hoffman told Plaintiff that Clayberger was drilling somewhere in one of the pile bents; (2) Plaintiff testified that, at the point Hoffman told him that Clayberger may be close to him,

59

Plaintiff was not concerned because "everywhere [he] was putting in bolts and there were holes, [he] knew around [him] [they] already did the work" and that "[he] knew [he] was most likely safe there"; (3) no one asked Plaintiff where he was; (4) when Plaintiff was ascending, he asked what Clayberger was doing, but he did not ask about Clayberger's location; and (5) once Plaintiff's hand was struck, he yelled "all stop" through the communication system to Hoffman, who communicated the order to Clayberger, who then stopped and ultimately removed the drill from Plaintiff's hand. (*See*, *supra*, Part I.B. of this Decision and Order.)

However, despite these undisputed facts, which tend to support Defendant Atlas's argument that the proximate cause of Plaintiff's injury was a failure to communicate rather than deficient radio communications equipment, one key exchange occurring immediately before Plaintiff's injury leaves a genuine dispute of material fact for the jury regarding proximate cause. Hoffman testified at his deposition that, immediately prior to the incident, he confirmed "with [Plaintiff] that he was in the correct location," and upon doing so, "[Plaintiff] asked [him], where is Tony[?]" (Dkt. No. 66-12, at 61-62.) Hoffman testified that he believed he "then told [Plaintiff] where Tony was, and then [he] started hearing [Plaintiff] scream." (*Id.*) Plaintiff stated in both his deposition and his affidavit that he did not hear this response from Hoffman. (Dkt. No. 66-6, at 188; Dkt. No. 73-17, at ¶ 3 ["I understand that Jeff Hoffman testified that just before I was injured he spoke into the system to tell me I was near Anthony Clayberger, who was going to be drilling a hole. Whatever he said never got to me."].)

Defendant Atlas argues that this exchange could not show proximate cause "because the accident was already happening even as Hoffman finished speaking (whether Plaintiff heard him or not)." (Dkt. No. 80, at 12.) However, although Plaintiff testified in his deposition that his

injury occurred "immediately after" he was told to "stand by," he also testified that by

"immediately" he meant that the injury could have occurred "seconds *or a couple of minutes*"

after he was told to stand by. (Dkt. No. 66-6, at 188 [emphasis added].) Based on this testimony,

a jury may reasonably find that Plaintiff's failure to hear Hoffman's communication about

Clayberger's location (which Plaintiff contends was due to the faulty radio communications

equipment) was the proximate cause of his injury.

      With respect to Defendant Atlas's third argument, the Court is persuaded that 12

N.Y.C.R.R. § 23-1.5(c) contains a notice requirement. Before addressing the Court's reasoning

on this issue, the Court recognizes that the New York Court of Appeals' decision in *Rizzuto v.*

*L.A. Wenger Contr. Co.*, 91 N.Y.2d 343 (N.Y. 1998) appears, at first glance, to favor Plaintiff:

> Since an owner or general contractor's vicarious liability under
> section 241(6) is not dependent on its personal capability to
> prevent or cure a dangerous condition, the absence of actual or
> constructive notice sufficient to prevent or cure must also be
> irrelevant to the imposition of Labor Law § 241(6) liability.

*Rizzuto*, 91 N.Y2d at 352. The *Rizzuto* Court stated that inclusion of a "control and/or notice for

an opportunity to cure" would merely "reincorporate[] a common-law standard of due care into

[Labor Law § 241(6)]," which in turn would "eliminat[e] the underlying basis of vicarious

liability and replicat[e] much of what Labor Law § 200 has been interpreted to require." *Id.* at

350.

      As Defendant Atlas points out, however, the *Rizzuto* Court assessed 12 N.Y.C.R.R. § 23-

1.7(d) in that case, which states that "[e]mployers shall not suffer or permit any employee to use

a floor, passageway, scaffold, platform or other elevated working surface which is in a slippery

condition." 12 N.Y.C.R.R. § 23-1.7(d). This regulation differs from the one involved in this case,

because 12 N.Y.C.R.R. § 23-1.5(c)(3) not only gives a general directive that "all safety devices, safeguards, and equipment in use shall be kept sound and operable," but also states that any unsound or inoperable equipment "shall be immediately repaired or restored or immediately removed from the job site if damaged." 12 N.Y.C.R.R. § 23-1.5(c)(3). The second clause of 12 N.Y.C.R.R. § 23-1.5(c)(3) differentiates the regulation from the one at issue in *Rizzuto*, leading courts to find that this second clause implies a notice requirement. *Id.*; *see also Nicola v. United Veterans Mut. Hous. No. 2, Corp.*, 178 A.D.3d 937, 940 (N.Y. App. Div. 2d Dep't 2019) (finding the defendants were entitled to summary judgment on the Labor Law § 241(6) claim alleging violations of 12 N.Y.C.R.R. 23-1.5(c)(3) because they "demonstrated, prima facie, that they lacked notice of any defect or unsafe condition in the hammer drill"); *Shaw v. Scepter, Inc.*, 187 A.D.3d 1662, 1665 (N.Y. App. Div. 4th Dep't 2020).

The Court's review of a similar Industrial Code regulation also supports its interpretation of a notice requirement in 12 N.Y.C.R.R. § 23-1.5(c)(3). More specifically, 12 N.Y.C.R.R. § 23-9.2(a) states that "[a]ll power-operated equipment shall be maintained in good repair and in proper operating condition at all times," and that, "[u]pon discovery, any structural defect or unsafe condition in such equipment shall be corrected by necessary repairs or replacement." 12 N.Y.C.R.R. § 23-9.2(a); *Becerra v. Promenade Apartments, Inc.*, 126 A.D.3d 557, 558 (N.Y. App. Div. 1st Dep't 2015) (finding that 12 N.Y.C.R.R. § 23-1.5(c)(3) is "functionally indistinguishable from the third sentence of section 23-9.2(a)"). The Second Department in *Ramos v. Patchogue-Medford Sch. Dist.*, 73 A.D.3d 1010 (N.Y. App. Div. 2d Dep't 2010) addressed 23 N.Y.C.R.R. § 23-9.2(a) as the basis for the plaintiff's Labor Law § 241(6) claim and, using similar logic as that addressed in *Nicola* and adopted today by this Court, the court in

*Ramos* found that the defendants were entitled to judgment as a matter of law on the plaintiff's Labor Law § 241(6) claim "by demonstrating that they lacked notice of any structural defect or unsafe condition in the power-operated concrete pump truck near which the plaintiff was working at the time of his accident." *Ramos*, 73 A.D.3d at 1012; *see also Salerno v. Diocese of Buffalo*, 161 A.D.3d 1522, 1523 (N.Y. App. Div. 4th Dep't 2018).

Importantly, the Court's finding that 12 N.Y.C.R.R. § 23-1.5(c)(3) contains a notice requirement does not run afoul of *Rizzuto's* concern about Labor Law § 241(6) claims becoming mere replications of Labor Law § 200 and common law negligence claims. *Rizzuto*, 91 N.Y2d at 350. Rather, the Court here makes the limited determination that, based on the specific language in the second clause of 12 N.Y.C.R.R. § 23-1.5(c)(3) (which is not present in the regulation at issue in *Rizzuto*), Defendant Atlas cannot be liable for a Labor Law § 241(6) claim predicated on 12 N.Y.C.R.R. § 23-1.5(c)(3) without notice of the allegedly defective radio communications equipment.

Nonetheless, the Court's finding regarding a notice requirement with respect to 12 N.Y.C.R.R. § 23-1.5(c)(3) does not foreclose Plaintiff's Labor Law § 241(6) claim against Defendant Atlas because Defendant Atlas has failed to show that there is no dispute of material fact regarding whether it *should have known* of the allegedly defective radio communications equipment. [22] In the recent decision of *Lopez v. City of New York*, 203 A.D.3d 405 (N.Y. App. Div. 1st Dep't Mar. 1, 2022), the First Department found that the Supreme Court properly denied

---

[22]     The Court notes that it is not implying that such evidence does not exist or that Defendant Atlas did not perform the inspections. Rather, this Decision and Order is limited to the facts and evidence submitted to it by Defendant Atlas in its motion.

the defendants' motion for summary judgment with respect to the plaintiff's Labor Law § 241(6) claim predicated on 12 N.Y.C.R.R. § 23-1.5(c)(3). More specifically, the First Department stated that one reason supporting the denial of the motion was that "defendants failed to meet their burden of showing they had no notice of the defective whip check, *as they submitted no evidence that they conducted a safety inspection of the whip check before the accident.*" *Lopez*, 203 A.D.3d at 406 (emphasis added).

The court in *Lopez* relied on *Viruet v. Purvis Holdings, LLC*, 198 A.D.3d 587 (N.Y. App. Div. 1st Dept. 2021), where the court found that the "the 'upon discovery' language in [12 N.Y.C.R.R.] § 23-9.2(a) placed an *affirmative duty* on defendant to conduct all necessary inspections to ensure compliance with safety regulations." *Viruet*, 198 A.D.3d at 588. Having already stated that 12 N.Y.C.R.R. § 23-9.2(a) is analogous to the regulation at issue in this case—a fact that Defendant Atlas also admits by citing it as support in its reply brief[23]—the Court finds *Lopez* to be persuasive on this issue. *Becerra*, 126 A.D.3d at 558.

Here, Defendant does not set forth undisputed facts regarding any inspections it undertook with respect to Defendant Finger Lakes' equipment. Nor does Defendant Atlas's memoranda of law (or any other filings relevant to Defendant Atlas's motion for summary judgment)[24] address the role of inspections or whether it should have known of the allegedly defective condition, as the *Lopez* Court addresses.

For this reason, the Court denies Defendant Atlas's motion for summary judgment with

---

[23]    (Dkt. No. 80, at 13-14.)

[24]    Plaintiff filed a letter brief in this case on March 16, 2022, informing the Court of *Lopez*, 203 A.D.3d 405, which was decided at the beginning of March 2022. (Dkt. No. 82). Defendant Atlas did not respond to Plaintiff's letter brief. (*See generally* Dkt. Sheet.)

respect to Plaintiff's Labor Law § 241(6) claim to the extent that claim relies on an alleged

violation of 12 N.Y.C.R.R. § 23-1.5(c)(3) but grants that motion to the extent the claim relies on

an alleged violation of 12 N.Y.C.R.R. § 23-1.5(c)(1).

### 2.  Defendant Atlas's Claim Against Defendant C.D. Perry

In its motion for summary judgment, Defendant Atlas further requests that the Court

grant its claim of contractual indemnification[25] against Defendant C.D. Perry, or, in the

alternative, render conditional judgment on this issue. (Dkt. No. 66-18, at 15-19.) Defendant

Atlas relies on the following provision of the contract between Defendant Atlas and Defendant

C.D. Perry:

> To the fullest extent permitted by law, the Subcontractor shall
> indemnify and hold harmless the . . . Contractor . . . from and against
> claims, damages, losses and expenses, including but not limited to
> attorney's fees, arising out of or resulting from performance of the
> Subcontractor's Work under this Subcontract, provided that any
> such claim, damage, loss or expense is attributable to bodily injury,
> sickness, disease or death, or to injury to or destruction of tangible
> property (other than the Work itself), *but only to the extent caused
> by the negligent acts or omissions of the Subcontractor, the
> Subcontractor's Sub-subcontractors, anyone directly or indirectly
> employed by them or anyone for whose acts they may be liable*,
> regardless of whether or not such claim, damage, loss or expense is
> caused in part by a party indemnified hereunder.

(Dkt. No. 66-4, at 10 [quoting § 4.6.1] [emphasis added].) Similarly, the relevant provision from

---

[25]     In its "Answer to Plaintiff's Amended Complaint with Cross-Claims," Defendant Atlas
asserts three crossclaims: (1) a crossclaim for contractual indemnification against Defendant
C.D. Perry; (2) a crossclaim for contractual insurance indemnification against Defendant C.D.
Perry; and (3) a crossclaim for common law indemnification and contribution against Defendant
C.D. Perry and Defendant Finger Lakes. (Dkt. No. 30.) However, in its motion for summary
judgment, Defendant Atlas seeks summary judgment solely on its crossclaim for contractual
indemnification from Defendant C.D. Perry. (Dkt. No. 66-18, at 2, 15.)

the subcontract between Defendant C.D. Perry and Defendant Finger Lakes reads as follows:

> To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless Contractor, and agents and employees of Contractor, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of Subcontractor's Work, provided that such claim, damages, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting therefrom, **but** *only to the extent caused in whole or in part by negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by Subcontractor or anyone for whose acts Subcontractor may be liable.* Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist under law or under any other terms of this Agreement, or any other agreement between the parties hereto.

(Dkt. No. 67-4, at 6 [quoting paragraph 3.7.1] [emphasis added].)

The Court declines to enter judgment (including a conditional order) on the issue of indemnification at this time, "[b]ecause neither liability nor damages have been determined with respect to the main action . . . ." *Great Lakes Cheese of New York, Inc. v. Agri-Mark, Inc.*, 14-CV-0232, 2016 WL 5717337, at *13 (N.D.N.Y. Sept. 30, 2016) (Suddaby, C.J.). The lack of liability determination, including the remaining disputes of material fact regarding any alleged negligence by Defendant Finger Lakes and whether such alleged negligence was the proximate cause of Plaintiff's injury, is especially important where, as here, the contractual language regarding indemnification hinges on a finding of negligence. *Laneuville v. Gen. Motors Corp.*, 93 F. Supp. 2d 272, 274-76 (N.D.N.Y. 2000) (McAvoy, J.); *In re Bridge Const. Servs. of Florida, Inc.*, 140 F. Supp. 3d 324, 331-32 (S.D.N.Y. Oct. 24, 2015); *Wensley v. Argonox Const. Corp.*, 228 A.D.2d 823, 825 (N.Y. App. Div. 3d Dep't 1996).

*Laneuville v. General Motors Corp.*, 93 F. Supp. 2d 272 (N.D.N.Y. 2000), is instructive

66

here. In *Laneuville*, General Motors (the owner) and OHM (the general contractor) sought

contractual indemnification against Kirk (the subcontractor) for the injuries the plaintiff

sustained while employed by Kirk on the construction project. *Laneuville*, 93 F. Supp. 2d at 274.

General Motors and OHM argued that, "because the record reveal[ed] that Plaintiff's injuries

were caused by Kirk's negligence and its failure to comply with applicable provisions of New

York Labor Law, absent independent negligence on the part of either General Motors or OHM,

General Motors and OHM [were] entitled to contractual indemnification from Kirk." *Id.* Judge

McAvoy of this Court disagreed, however, due to the specific language at issue in the

indemnification provision:

> By the plain terms of the indemnification provision contained in the
> Subcontract Agreement, Kirk, the subcontractor, is required to
> indemnify OHM, the general contractor, for all claims and damages
> to the extent that the injury or loss was caused by a negligent act or
> omission of Kirk or Kirk's violation of the applicable provisions of
> New York Labor Law. . . . . However, General Motors and OHM
> fail to demonstrate an absence of material issues of fact with respect
> to Kirk's negligence; rather, [they] assume that because they were
> not negligent, it necessarily follows that it was Kirk's negligence
> that caused Plaintiff's injuries. Such a conclusion is unsupported by
> the record currently before the Court. *Whether [General Motors'*
> *and OHM's] contractual right of indemnification will in fact be*
> *triggered is uncertain at this point for it turns on something that is*
> *presently unknown, namely, whether [Kirk] was negligent and, if so,*
> *whether its negligence was a proximate cause of the accident.*
> Accordingly, because factual issues remain concerning whether
> Plaintiff's injuries were caused by Kirk's negligence (or violations
> of the applicable provisions of New York Labor Law), [General
> Motors and OHM] are not entitled to summary judgment with
> respect to its cause of action for contractual indemnity.

*Id.* at 275-76 (internal citations and quotation marks omitted).

Here, genuine disputes of material fact remain regarding Defendant Finger Lakes' alleged

negligence, and whether any alleged negligence was the proximate cause of Plaintiff's injury.

67

The Court therefore denies Defendant Atlas's motion without prejudice with respect to contractual indemnification. *Great Lakes Cheese of New York, Inc.*, 2016 WL 5717337, at *13; *Csikos v. S.M. Constr. & Contracting, Inc.*, 18-CV-9598, 2021 WL 5771921, at *6 (S.D.N.Y. Dec. 3, 2021) (citing *Pac. Emps. Ins. Co. v. Saint Francis Care, Inc.*, 729 F. App'x 129, 130 (2d Cir. 2018) (summary order)).

> **B.   Whether the Court Should Grant Defendant C.D. Perry's Motion for Summary Judgment**

After carefully considering the matter, the Court answers this question in the negative with respect to Plaintiff's Labor Law § 241(6) claim and unseaworthiness claim and Defendant C.D. Perry's crossclaim against Defendant Finger Lakes for contractual indemnification, for the reasons set forth in Plaintiff's and Defendant Finger Lakes' memoranda of law. (Dkt. Nos. 74-19, 75-1.) The Court answers this question in the affirmative, however, with respect to Plaintiff's other claims and Defendant C.D. Perry's crossclaim against Defendant Finger Lakes for failure to procure insurance, for the reasons stated in Defendants C.D. Perry's memoranda of law. (Dkt. Nos. 67-16, 78, 79.) To those reasons, the Court adds the following analysis, which is intended to supplement, and not to supplant, the parties' reasoning.

> **1.   Plaintiff's Claims Against Defendant C.D. Perry**

> **a.   Negligence Claim Pursuant to the Jones Act**

In his Amended Complaint, Plaintiff asserted a Jones Act negligence claim against both Defendant C.D. Perry and Defendant Finger Lakes. (Dkt. No. 20, at ¶¶ 21-27.) However, after Defendant C.D. Perry argued that Plaintiff had failed to show that he was a borrowed servant, Plaintiff conceded in his opposition that he is asserting his Jones Act negligence claim against only Defendant Finger Lakes. (Dkt. No. 74-19, at 10-11.) The Court therefore grants Defendant

C.D. Perry's motion for summary judgment with respect to this claim against it.

### b.   Labor Law § 200 Claim

As the Court previously addressed in Part III.A.1.a. of this Decision and Order, Plaintiff's

injury arose out of the manner in which the work was performed (i.e., through use of Defendant

Finger Lakes' allegedly defective radios or improper communication by Defendant Finger

Lakes' employees), and not a dangerous or defective premises condition. Like he did in his

opposition to Defendant Atlas's motion for summary judgment, however, Plaintiff does not

contend that his injury occurred due to the manner in which the work was performed and that

Defendant C.D. Perry exercised supervisory control over the injury-producing work; rather,

Plaintiff again proceeds under the theory that the allegedly deficient radio communications'

equipment constituted a "defective condition" of which Defendant C.D. Perry would have

constructive notice through reasonable inspection. (Dkt. No. 74-19, at 28-30.) This argument is

unpersuasive, for the reasons previously set forth in Part III.A.1.a. of this Decision and Order.

The Court accordingly grants Defendant C.D. Perry's motion for summary judgment on

Plaintiff's Labor Law § 200 claim against it.

### c.   Labor Law § 241(6) Claim

In its motion for summary judgment, Defendant C.D. Perry argues that Plaintiff's Labor

Law § 241(6) claim fails for three reasons: (1) it is preempted by Section 905(b) of the LHWCA;

(2) Defendant C.D. Perry was not responsible for Plaintiff's safety or the general safety over the

project, because Labor Law § 241(6) provides a nondelegable duty to owners and general

contractors, which it was not; and (3) Plaintiff failed to allege any specific Industrial Code

provisions upon which he can base his Labor Law § 241(6) claim. (Dkt. No. 67-16, at 13-14, 16-

17.) In its reply brief, Defendant C.D. Perry also argues that the Court should dismiss Plaintiff's Labor Law § 241(6) claim for three additional related reasons: (1) the allegedly defective equipment was not the proximate cause of Plaintiff's accident; (2) communication between coworkers does not constitute a "safety device," as Plaintiff alleges; and (3) the language in 12 N.Y.C.R.R. § 23-1.5(c)(1) is too general to serve as a predicate for Plaintiff's Labor Law § 241(6) claim.  (Dkt. No. 78, at 8-9.)

With respect to Defendant C.D. Perry's preemption argument, Plaintiff argues that, as a "seaman" employed by Defendant Finger Lakes who worked on a vessel (i.e., the barge) provided by Defendant C.D. Perry, the LHWCA does not apply to him and cannot preempt his Labor Law § 241(6) claim.[26] (Dkt. No. 74-19, at 11-12.) Plaintiff alternatively argues that, even if he is not a "seaman" and is instead covered by the LHWCA, he can still assert his Labor Law § 241(6) claim because he asserts those claims against Defendant C.D. Perry in its capacity as a construction contractor, not as a vessel owner. (*See* Dkt. No. 20 [pleading vessel negligence claim under the LHWCA "[i]f this Honorable Court determines that plaintiff was not employed as a seaman . . ."]; Dkt. No. 74-19, at 14-17.)

A genuine dispute of material fact remains regarding Plaintiff's status as a "seaman," or alternatively, as a covered employee under the LHWCA, meaning the Court cannot determine whether the LHWCA applies to Plaintiff and preempts his Labor Law § 241(6) claim.[27] *See*

---

[26]    The Court notes that Defendant's preemption argument applies only to Plaintiff's Labor Law § 241(6) claim. (Dkt. No. 67-16, at 13 ["Plaintiff's Labor Law 241(6) claim does not apply because it is preempted by federal maritime law."]; Dkt. No. 74-19, at 16.) *Asjian v. Orion Power Holdings, Inc.*, 70 A.D.3d 738, 740 (N.Y. App. Div. 2d Dep't 2010).

[27]    Importantly, the Supreme Court has "concluded that Congress intended the term ["seaman"] to have its established meaning under general maritime law at the time the Jones Act

70

*Stewart v. Dutra Const. Co.*, 543 U.S. 481, 488 (2005); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 355-56 (1995); *Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81, 87 (1991). Section 905(b) of the LHWCA explicitly states that, "[i]n the event of injury to *a person covered under this chapter* caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages thereof, may bring an action against such vessel as a third party . . . ." 33 U.S.C. § 905(b). The LHWCA defines "employee" (i.e., those covered by the Act) as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairmen, ship builder, and ship-breaker," but specifically excludes "a master or member of a crew of any vessel." 33 U.S.C. § 902(3); *Stewart*, 543 U.S. at 488 (finding that "[t]his exception is simply 'a refinement of the term 'seaman' in the Jones Act").

For Plaintiff to qualify as a "seaman," rather than a covered employee under the LHWCA, the following two requirements must be met: "(1) [his] duties must contribut[e] to the function of the vessel or to the accomplishment of its mission, and (2) [he] must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." *Guarascio v. Drake Assocs., Inc.*, 06-CV-15185, 2008 WL 4222034, at *1 (S.D.N.Y. Sept. 15, 2008) (internal quotation marks omitted). "Whether an employee qualifies as a seaman 'is a mixed question of law and fact.'" *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 63-64 (2d Cir. 2002) (quoting *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554 (1997)). "Even so, '[t]he inquiry into seaman status is of necessity *fact-specific*; it will depend on the nature of the

---

was enacted." *Chandris*, 515 U.S. at 355.

vessel, and the employee's precise relation to it." *Sw. Marine, Inc.*, 502 U.S. at 492 (emphasis added). Summary judgment is appropriate "'where the facts and the law will reasonably support only one conclusion.'" *Guarascio*, 2008 WL 4222034, at *2 (quoting *Wilander*, 498 U.S. at 356); *Chandris*, 515 U.S. at 371.

In this case, Defendant C.D. Perry's memoranda of law do not address the question of whether Plaintiff qualifies as a "seaman"; rather, Defendant C.D. Perry seemingly intertwines the two statutes when it states that, because "[P]laintiff alleges he qualifies as a Jones Act Seaman and [is] entitled to damages under the Longshore and Harbor Workers' Compensation Act[,] he is not entitled to maintain a claim for damages under New York State Labor Law 241(6)." (Dkt. No. 67-16, at 13-14.) Although Plaintiff contends that he is a "seaman," he also states that this is a fact question for the jury. (Dkt. No. 67-16; Dkt. No. 74-19, at 10-11.) The undisputed facts from Defendant C.D. Perry's motion, which merely provide that Plaintiff was a diver performing underwater timber restoration work at the project site, also do not provide the Court with the requisite factual allegations for it to determine whether Plaintiff meets the two requirements for "seaman" status. (*See*, *supra*, Part I.B. of this Decision and Order.) Based on the limited facts and lack of briefing on this issue, the Court finds that "'reasonable persons, applying the proper legal standard, could differ as to whether [Plaintiff] was a "member of the crew," and therefore it is a question left for the jury. *Guarascio*, 2008 WL 4222034, at *2 (quoting *Chandris*, 515 U.S. at 369 and *Wilander*, 498 U.S. at  355). Accordingly, Defendant C.D. Perry's preemption argument cannot be decided at this stage of the action.

Likewise, Plaintiff's Labor Law § 241(6) claim is not rendered unreasonable by Defendant C.D. Perry's argument that it is not a statutory agent of Defendant Atlas. "To hold a

subcontractor or statutory agent of the owner or general contractor absolutely liable for

violations of Labor Law §§ 240 and 241, there must be a showing that the subcontractor had the

authority to supervise and control the work giving rise to these duties[.]" *Kehoe v. Segal*, 272

A.D.2d 583, 584 (N.Y. App. Div. 2d Dep't 2000); *Musillo v. Marist College*, 306 A.D.2d 782,

783-84 (N.Y. App. Div. 3d Dep't 2003). "'The determinative factor is whether the party had the

right to exercise control over the work, not whether it actually exercised that right.'" *Fiore v.*

*Westerman Constr. Co., Inc.*, 186 A.D.3d 570, 570 (N.Y. App. Div. 2d Dep't 2020) (quoting

*Bakhtadze v. Riddle*, 56 A.D.3d 589, 590 (N.Y. App. Div. 2d Dep't 2008)).

     The case of *Britez v. Madison Park Owner, LLC*, 106 A.D.3d 531 (N.Y. App. Div. 1st

Dep't 2013) is instructive here. In *Britez*, G Builders (the construction manager) "entered into a

subcontract with National for the drywall and carpentry work," "National subcontracted part of

its work to Citywide Interiors Contractors, Inc.," and Citywide Interiors "in turn subcontracted

the taping and spackling work to plaintiff's employer, Pecci Construction, LLC." *Britez*, 106

A.D.3d at 532. The Court found that National was a statutory agent of G Builders under Labor

Law § 241(6):

> The Purchase Order between G Builders and National delegated
> "all DRYWALL, CARPENTRY AND CEILING scope of work"
> to National, which thus "obtain[ed] the concomitant authority to
> supervise and control that work" and became G Builders' statutory
> agent under Labor Law §§ 240(1) and 241(6)[.] Further
> demonstrating National's supervisory authority are the Purchase
> Order's requirement that National submit to G Builders "a listing
> of all proposed onsite supervision and associated management"
> and National's subcontracting of a portion of its work to another
> subcontractor[.]

*Id.* at 532 (internal citations omitted); *see also Van Hoesen v. Dolen*, 94 A.D.3d 1264, 1267

(N.Y. App. Div. 3d Dep't 2012) ("Superior was not liable under Labor Law §§ 240 and 241 as a

general contractor or the Dolens' agent, as there was no evidence that it was 'granted the power to enforce safety standards and hire subcontractors . . . [or it had] authority to supervise and control the activity which brought about the injury'") (quoting *Bowles v. Clean Harbors Envtl. Servs., Inc.*, 72 A.D.3d 1307, 1308-09 (N.Y. App. Div. 3d Dep't 2010) (alteration in original)); *McKay v. Weeden,* 148 A.D.3d 1718, 1719 (N.Y. App. Div. 4th Dep't 2017) ("Because the drywall work had been delegated to [the subcontractor] by [the contractor], [the subcontractor] obtained the concomitant authority to supervise and control that work, and  . . . therefore became a statutory agent of [the contractor]. Furthermore, plaintiff was injured while engaged in an activity delegated to [the subcontractor].") (cleaned up); *Tuccillo v. Bovis Lend Lease, Inc.*, 101 A.D.3d 625, 628 (N.Y. App. Div. 1st Dep't 2012); *Edwards*, 196 A.D.3d at 778.

The undisputed facts in this case show that, at very least, Defendant C.D. Perry was initially responsible for the waterborne woodwork after entering into its contract with Defendant Atlas. Thereafter, Defendant C.D. Perry subcontracted the underwater woodwork to Defendant Finger Lakes because Defendant C.D. Perry did not employ certified divers. The subcontract between Defendant Atlas and Defendant C.D. Perry also addressed Defendant C.D. Perry's role with respect to "safety precautions and standards" by stating that Defendant C.D. Perry "shall comply with the safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations . . . ." (Dkt. No. 66-4.)

Further, to the extent the undisputed facts show that Defendant C.D. Perry did not actually *exercise* supervisory control over the activity which brought about Plaintiff's injury, these facts do not change the outcome of the Court's agency analysis. Rather, the issue of whether Defendant C.D. Perry was Defendant Atlas's statutory agent depends on "[t]he entity's

right to exercise control over the work . . . , regardless of whether it actually exercised that right[.]" *Milanese v. Kellerman*, 41 A.D.3d 1058, 1061 (N.Y. App. Div. 3d Dep't 2007). Based on these facts, the Court cannot grant Defendant C.D. Perry's motion for summary judgment based on its argument that it was not Defendant Atlas's statutory agent.

Defendant C.D. Perry's additional arguments do not lead to dismissal of Plaintiff's Labor Law § 241(6) claim against it. Contrary to Defendant C.D. Perry's contention, Plaintiff did specify two regulations (i.e., 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3)) to support his Labor Law § 241(6) claim. Not only did Plaintiff's expert identify those specific regulations in his expert report, but Plaintiff's counsel also sent an email to counsel for all parties (including Defendant C.D. Perry) as a means of supplementing his Fed. R. Civ. P. 26 disclosures and interrogatory responses stating that Plaintiff would rely on 12 N.Y.C.R.R. §§ 23-1.5(c)(1) and (3), at a minimum, to support his Labor Law § 241(6) claim. (Dkt. Nos. 73-15, 73-16.)

To the extent Defendant C.D. Perry reargues the same points set forth in Defendant Atlas's motion for summary judgment, the Court grants Defendant C.D. Perry's motion with respect to 23 N.Y.C.R.R. § 23-1.5(c)(1) being too general to support a Labor Law § 241(6) claim, and disagrees with any proximate cause argument, for the reasons set forth above in Part III.A.1.b. of this Decision and Order.

Further, the Court is unpersuaded by Defendant C.D. Perry's argument that the radio communications equipment could not constitute a "safety device." (Dkt. No. 78, at 8.) Defendant C.D. Perry hinges its argument on the fact that New York State courts have found that "neither coworkers nor safety instructions constitute safety devices." (*Id.* [citing *Miranda v. Norstar Bldg. Corp.*, 79 A.D.3d 42, 47 (N.Y. App. Div. 3d Dep't 2010)].) However, the specific issue at this

75

stage of the case is whether *the radio communications equipment* constituted a "safety device," not whether the potentially inadequate communication between Plaintiff and Hoffman or Clayberger constituted a "safety device." The case upon which Defendant C.D. Perry relies also addressed a different Labor Law section (i.e., Labor Law § 240(1)), which focuses on "scaffolding and other devices for use of employees" and employs different language than Labor Law § 241(6) by specifically listing specific "devices" in the regulation. *Miranda*, 79 A.D.3d at 47 (quoting N.Y. Labor Law § 240(1)).

Here, Defendant Finger Lakes used the radio communications equipment because, while performing the underwater work, divers' vision was limited, and the radios were the only means of communicating about what was happening underwater (i.e., the work being performed, where the work was being performed, when tools were "hot," location of the divers, etc.). (Dkt. No. 74-19, at 17-18.) The Court notes that 12 N.Y.C.R.R. § 23-1.5(c)(3) states that all "safety devices, safeguards and *equipment* in use shall be kept sound and operable," further undercutting Defendant C.D. Perry's argument that the allegedly defective radio communications equipment cannot trigger this specific regulation.

For these reasons, the Court denies Defendant C.D. Perry's motion with respect to Plaintiff's Labor Law § 241(6) claim to the extent it is predicated on 12 N.Y.C.R.R. § 23-1.5(c)(3).

### d.  Unseaworthiness Claim

Plaintiff's unseaworthiness claim hinges on whether he is a "seaman," which, as the Court addressed above in Part III.B.1.c. of this Decision and Order, cannot be decided at the summary judgment stage due to outstanding issues of material fact and lack of argument on the

issue by both Defendant C.D. Perry and Plaintiff.[28] *See Matter of Franz*, 13-CV-0411, 2016 WL 922793, at *8 (N.D.N.Y. Mar. 10, 2016) (Sharpe, J.) (finding an individual did "not have a cognizable unseaworthiness claim against any alleged tortfeasor because . . . he [was] not a seaman") (citing *Scindia*, 451 U.S. at 165); *Anastasiou v. M/T World Trust*, 338 F. Supp. 2d 406, 417-18 (E.D.N.Y. Oct. 1, 2004) (dismissing the plaintiff's claim for "breach of the warranty of seaworthiness" where the court found he was "covered under the LHWCA"); *Marroquin v. Am. Trading Transp. Co., Inc.*, 711 F. Supp. 1165, 1167 (E.D.N.Y. 1988); *Clark v. Solomon Nav., Ltd.*, 631 F. Supp. 1275, 1283 (S.D.N.Y. Mar. 31, 1986).

However, the Court finds that, if Plaintiff is a "seaman" and therefore may bring an unseaworthiness claim, this claim would survive summary judgment. "Under general maritime law, unseaworthiness is a claim 'based on the vessel owner's duty to ensure the vessel is reasonably fit to be at sea.'" *Brown v. Reinauer Transp. Cos., L.P.*, 788 F. App'x 47, 49 (2d Cir. 2019) (summary order) (quoting *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001)). "A vessel is unseaworthy if the vessel, crew, and appurtenances are not reasonably fit for their intended use." *Borges v. Seabulk Int'l, Inc.*, 456 F. Supp. 2d 387, 391-92 (D. Conn. 2006) (internal quotation marks omitted). More specifically,

> [t]he condition of unseaworthiness "might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service."

---

[28]     Plaintiff concedes this point in his opposition to Defendant C.D. Perry's motion. (Dkt. No. 74-19, at 13 ["The unseaworthiness remedy is only applicable to a seaman . . . ."].)

*Matter of Brown*, 20-CV-4629, 2022 WL 2329927, at *4 (E.D.N.Y. June 2, 2022) (quoting *Usner v. Luckenback Overseas Corp.*, 400 U.S. 494, 499 (1971)).

Liability on an unseaworthiness claim is different than that based on negligence, because "'notice of dangerous condition or negligence in regard to that condition is immaterial for unseaworthiness actions under general maritime law.'" *Brown*, 2018 WL 9986677, at *4 (quoting *Usner*, 400 U.S. at 498). "[T]o prevail on a claim of unseaworthiness, a plaintiff must establish that a vessel was unseaworthy, in that it was insufficiently or defectively equipped, manned and/or maintained, and that his injuries resulted from the vessel's defective or insufficient condition." *Matter of Brown*, 2022 WL 2329927, at *4. "Strict liability attaches to a shipowner for injuries caused by the vessel's unseaworthy condition." *Brown*, 788 F. App'x at 49.

In analyzing whether Plaintiff's unseaworthiness claim should survive summary judgment, the Court must first address Plaintiff's failure to properly refute Defendant Atlas's undisputed fact stating that "the barge had nothing to do with the accident." (Dkt. No. 73-20, at 32 [responding by stating that "[t]he vessel itself did not cause the accident" and provided no record citation]; Dkt. No. 78, at 10 [highlighting that "Plaintiff even admits that the barge did not cause the accident"].) This undisputed fact seemingly prevents Plaintiff from moving forward with his unseaworthiness claim. However, although a very close call, the Court finds that the remaining disputed facts—specifically, whether the radio communications equipment was defective and, in turn, the cause of Plaintiff's injury—keep the Court from granting Defendant C.D. Perry's motion for summary judgment on this claim. Further, the specific undisputed fact does not reference whether the "appurtenances" on Defendant C.D. Perry's barge, such as the

radio communications equipment located in Defendant Finger Lakes' dive shack thereon, were not reasonably fit for their intended purpose.

As the Court previously addressed, genuine disputes of material fact remain regarding whether the radio communications equipment was defective, and whether this allegedly defective equipment caused Plaintiff's injury. The radio communications equipment could be viewed as an "appurtenance" to Defendant C.D. Perry's barge. *See Northville Indus. Corp. v. M/T PROTEUS*, 88-CV-5096, 1989 WL 120613, at *5 (S.D.N.Y. Oct. 4, 1989) ("I find that the vessel owner has proven by a fair preponderance of the evidence that the tug owner is at fault with respect to the radio communications.  Cannot conclude definitely whether it was a failure of the radio mechanism, *which would be unseaworthiness*, or the neglect of the tug captain.") (emphasis added). Further, the fact that Defendant Finger Lakes supplied the communications system and the dive shack in which it was located does not absolve Defendant C.D. Perry from liability on this claim, nor does the fact that Plaintiff did not sustain his injury on the barge. *See Massa v. C.A. Venezuelan Navigacion*, 298 F.2d 239, 240 (2d Cir. 1962) ("The fact that the stevedoring firm may have supplied the defective appurtenance, here the pallet, does not absolve the vessel owner from liability under the doctrine. Nor is the fact that the injury occurred on shore a bar to recovery so long as the requisite maritime 'status' or 'relation' is present.") (internal citations omitted). Accordingly, the Court denies Defendant C.D. Perry's motion for summary judgment on Plaintiff's unseaworthiness claim.

### e.  Vessel Negligence Claim Pursuant to 33 U.S.C. § 905(b)

Regardless of whether Plaintiff is a "seaman" or, alternatively, is covered by the LHWCA, Plaintiff failed to set forth any argument in its opposition to Defendant C.D. Perry's

motion as to why his vessel negligence claim under 33 U.S.C. § 905(b) should survive summary judgment. Rather, Plaintiff focused solely on whether Section 905(b) of the LHWCA (if applicable in this action) preempts his Labor Law claims, which the Court addressed above in Part III.B.1.c. (Dkt. No. 74-19, at 14-16.)

Because Plaintiff does not argue the merits of his vessel negligence claim, the Court finds that Defendant C.D. Perry has met its modest burden[29] with respect to that claim. Defendant C.D. Perry may be liable for breaching the following three duties under Section 905(b): (1) the "turn over duty," where "[t]he owner is liable if, on turning the ship over to the stevedore, it fails to warn of hidden defects which the owner should have known about"; (2) the "active control duty," where "[t]he owner is liable for injury caused by hazards under the control of the ship"; and (3) the "duty to intervene," where [t]he owner is liable if it fails to intervene in the stevedore's operations when the owner has actual knowledge both of the hazard and that the stevedore, in the exercise of 'obviously improvident' judgment, means to continue work notwithstanding and, therefore, cannot be relied on to remedy the danger." *Gravatt v. City of New York*, 97-CV-0354, 1999 WL 111922, at *27 (S.D.N.Y. Mar. 3, 1999) (*citing Scindia*, 451 U.S. 156); *Matter of Franz*, 13-CV-0411, 2016 WL 922793, *4-6 (N.D.N.Y. Mar. 10, 2016) (Sharpe, J.).

Here, the undisputed facts show (and Plaintiff does not argue otherwise in his opposition)

---

[29]     *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

that neither Plaintiff nor any other Defendant Finger Lakes' employee identified issues or defects

with the barge itself, much less when the barge was "turned over" to Defendant Finger Lakes for

use as a staging area for the underwater timber restoration work. *Gravatt*, 1999 WL 11922, at

*27. Nor has Plaintiff identified any hazards "under control of the ship" or of which Defendant

C.D. Perry had "actual knowledge." *Id.*[30] The Court therefore grants Defendant C.D. Perry's

motion for summary judgment with respect to Plaintiff's vessel negligence claim.

### 2.   Defendant C.D. Perry's Claims Against Defendant Finger Lakes

Preliminarily, the Court denies Defendant C.D. Perry's claim for contractual

indemnification for the reasons previously set forth with respect to Defendant Atlas's claim of

contractual indemnification. (*See*, *supra*, Part III.A.2. of this Decision and Order.) However, the

Court does agree with Defendant C.D. Perry that Defendant Finger Lakes breached their contract

by failing to procure insurance and not adding Defendant C.D. Perry as an additional insured.

(Dkt. No. 67-16, at 19-20.)[31]

Section 8.3.2 of the subcontract between Defendant C.D. Perry and Defendant Finger

Lakes states that "Subcontractor [Finger Lakes] shall purchase and maintain insurance for the

---

[30]      The Court notes that the strict liability standard applicable to Plaintiff's unseaworthiness
claim is not at issue with respect to his vessel negligence claim (as the name of the claim
implies). *See, e.g., Arnold v. Excalibur Shipping Co.*, 470 F. Supp. 672, 673 (E.D. Va. 1979)
(addressing the 1972 amendments to the LHWCA and highlighting that "Congress provided that
the vessel would be liable to the longshoreman only for its own negligence"); *Scindia*, 451 U.S.
at 165-66 (creating the three respective duties previously identified because "Section 905(b) [of
the LHWCA] did not specify the acts or omissions of the vessel *that would constitute
negligence*") (emphasis added).

[31]      *See Calvitti v. 40 Garden, LLC*, 155 A.D.3d 1399, 1402 (N.Y. App. Div. 3d Dep't 2017)
(highlighting that "'[a]n agreement to procure insurance is *not* an agreement to indemnify or hold
harmless, and the distinction between the two is well recognized'") (quoting *Kinney v. Lisk, Co.*,
556 N.E.2d 1090, 1092 (N.Y. 1990)).

duration of the Project" for various types of coverage with corresponding limits of liability. (Dkt.

No. 67-4, at 7-8.) The same provision states that "Contractor, Owner, and all other parties

required of Contractor, shall be included as insured on the [commercial general liability]," and

that the umbrella coverage addressed in that provision "must include as insured all entities that

are additional insureds in the CGL and Auto." (*Id.*)

Defendant C.D. Perry argues that it "immediately tendered its defense and demanded

insurance coverage from Finger Lakes and its insurance providers under cover of letters dated

January 8, 2019, July 3, 2019, and most recently, April 15, 2021, but to no avail." (Dkt. No. 67-

16, at 20; Dkt. No. 67-14, at 4 [April 2021 Tender Letter to Finger Lakes' Counsel].) In response

to this argument, Defendant Finger Lakes does not assert that it obtained the requisite insurance

or that it added Defendant C.D. Perry as an additional insured, but instead stated that it was "not

privy to whatever response C.D. Perry may have received from its insurance providers" and that

it is "not able to discern on what basis C.D. Perry seemingly speculates that Finger Lakes failed

to procure insurance." (Dkt. No. 75, at 6.)

Based on these facts, the Court finds that Defendant Finger Lakes has failed to raise a

genuine dispute of material fact regarding whether it breached its contract by failing to procure

insurance. *Caputo v. Kimco Dev. Co.*, 226 A.D.2d 1142, 1142-43 (N.Y. App. Div. 4th Dep't

1996); *Moll v. Wegman's Food Mkts., Inc.*, 300 A.D.2d 1041, 1042 (N.Y. App. Div. 4th Dep't

2002); *Calvitti*, 155 A.D.3d at 1402.[32]

---

[32]     Although the Court finds that Defendant C.D. Perry is entitled to summary judgment on
its claim related to Defendant Finger Lakes' failure to procure insurance, it does not decide the
specific damages stemming from this breach of contract in this Decision and Order because the
parties did not address this specific issue, nor was the Court made aware of relevant facts, such
as whether Defendant C.D. Perry had its own general liability coverage. *See Antinello v. Young*

**ACCORDINGLY,** it is

**ORDERED** that Defendant Atlas's motion for summary judgment (Dkt. No. 66) is

**<u>GRANTED</u>** with respect to Plaintiff's Labor Law § 200 claim and Plaintiff's Labor Law §

241(6) to the extent it is premised upon 12 N.Y.C.R.R. § 23-1.5(c)(1), and **<u>DENIED</u>** with respect

to Plaintiff's Labor Law § 241(6) claim to the extent it is premised upon 12 N.Y.C.R.R. § 23-

1.5(c)(3) and with respect to Defendant Atlas's contractual indemnification claim against

Defendant C.D. Perry; and it is further

**ORDERED** that Defendant C.D. Perry's motion for summary judgment (Dkt. No. 67) is

**<u>GRANTED</u>** with respect to the following claims:

(a) Plaintiff's Jones Act negligence claim;

(b) Plaintiff's Labor Law § 200 claim;

(c) Plaintiff's Labor Law § 241(6) claim to the extent it is premised upon 12 N.Y.C.R.R.
§ 23-1.5(c)(1);

(d) Plaintiff's vessel negligence claim; and

(e) Defendant C.D. Perry's breach-of-contract claim against Defendant Finger Lakes for
failing to procure insurance; and it is further

**ORDERED** that Defendant C.D. Perry's motion for summary judgment (Dkt. No. 67) is

---

*Men's Christian Ass'n*, 42 A.D.3d 851, 851-52 (N.Y. App. Div. 3d Dep't 2007) ("Where, as here, a promisee has general liability coverage . . ., any damages arising out of an agreement to procure insurance are limited to out-of-pocket expenses[.]"); *Caputo*, 226 A.D.2d at 1142 (finding the party who failed to procure insurance was "liable for the resulting damages, which include the costs and expenses of defending plaintiffs' action"); *Wong v. New York Times Co.*, 297 A.D.2d 213, 216-17 (N.Y. App. Div. 1st Dep't 2002) (addressing the distinction of which types of damages a party may recover where a promisor fails to procure insurance).

**DENIED** with respect to Plaintiff's Labor Law § 241(6) claim to the extent it is premised upon

12 N.Y.C.R.R. § 23-1.5(c)(3), Plaintiff's unseaworthiness claim, and Defendant C.D. Perry's

claim against Defendant Finger Lakes for contractual indemnification.

Date:   August 30, 2022
        Syracuse, New York

Glenn T. Suddaby
Chief U.S. District Judge